OHIO–SEALY MATTRESS MANUFACTURING COMPANY, Sealy Mattress Company of Houston, Sealy Mattress Company of Puerto Rico, Inc., Sealy of the Northeast, Inc., and Sealy Mattress Company of Georgia, Inc., Plaintiffs-Counterdefendants Appellants-Cross-Appellees,

v.

SEALY, INCORPORATED, Sealy Spring Corporation—Indiana, Sealy Spring Corporation—East, Sealy Spring Corporation—West, Sealy Mattress Company of Colorado, Inc., Sealy Mattress Company of Northern California, Inc., Sealy Mattress Company of Southern California, Inc., Schnorr Manufacturing Company, Inc., Sealy Mattress Company of Florida, Inc., Sealy Mattress Company of Pittsburgh, Inc., Sealy Mattress Company of Philadelphia, Inc., Defendants-Counterplaintiffs Appellees-Cross-Appellants.

Nos. 77–1239, 77–1240.

United States Court of Appeals, Seventh Circuit.

Argued April 20, 1978.

Decided Oct. 11, 1978.

As Amended Oct. 12, 1978.

Frederic F. Brace, Jr., Chicago, Ill., for appellant.

Phil C. Neal, Friedman & Koven, Chicago, Ill., for appellee.

Before FAIRCHILD, Chief Judge, MOORE, Senior Circuit Judge,* and PELL, Circuit Judge.

PELL, Circuit Judge.

Sealy, Incorporated (Sealy) owns trademarks for the "Sealy" brand of mattresses, mattress foundations, and other bedding products. The Sealy brand enjoys substantial national consumer popularity, and Sealy licenses its trademarks to fifteen independent manufacturers, each of which has the primary responsibility to make and sell Sealy products in a defined territory or territories. Sealy receives license royalties, provides uniform product specifications, and also provides for the benefit of its licensees substantial national advertising, product development services, engineering assistance, sales training, and a means of central negotiation for selling to national retail organizations and purchasing certain mattress components. In addition, Sealy itself manufactures and sells mattresses in seven territories, and it also manufactures spring units through three wholly-owned subsidiaries.[1] Over 98% of the stock of Sealy is owned by its licensees, only licensees (or their nominees) are eligible for 11 of the 14 seats on Sealy's Board of Directors, and the Board's Executive Committee is composed exclusively of licensees.

Ohio-Sealy Mattress Manufacturing Company (Ohio) is a Sealy licensee with primary responsibility for six territories. Ohio is the largest and one of the best of the Sealy licensees, producing a high quality product efficiently, selling it effectively, and compiling an enviable profit record.[2]

In *United States v. Sealy, Inc.*, 388 U.S. 350, 87 S.Ct. 1847, 18 L.Ed.2d 1238 (1967), the Supreme Court invalidated the system of exclusive manufacturing and sales territories on which Sealy then predicated its licenses. (Sealy at the time was not itself engaged in manufacturing mattresses.) Looking at "substance rather than form," *id.* at 352, 87 S.Ct. 1847, the Court thought it clear that the exclusive territories were restraints imposed by a horizontal combination of potential competitors, because Sealy was obviously "a joint venture of, by, and for its stockholder-licensees [who are] themselves directly, without even the semblance of insulation, in charge of Sealy's opera-

---

* Senior Circuit Judge Leonard P. Moore of the United States Court of Appeals for the Second Circuit is sitting by designation.

1. The subsidiaries through which Sealy makes and sells mattresses in its seven territories and makes spring units were also named as parties to this action.

2. Ohio services five of the territories through four subsidiaries, which are also parties herein.

tions." *Id.* at 353, 87 S.Ct. at 1850. Because the exclusive territory system operated to give each licensee an enclave free from the competition of other Sealy licensees, it amounted to an allocation of markets *per se* violative of Section 1 of the Sherman Act, 15 U.S.C. § 1,[3] without regard to asserted justifications for the system.[4]

After the Supreme Court's decision, Sealy revised its licensing agreement, eliminating exclusive selling territories. In 1971, Ohio initiated this action, complaining that Sealy had continued to effect the evils the Supreme Court condemned, albeit by more subtle means, that Sealy's methods of dealing with national retail customers also violated the Sherman Act, and that Sealy was engaged in illegal tying and price-fixing arrangements regarding certain mattress components. Damages well in excess of $6,000,000 were claimed, and declaratory and injunctive relief was sought. Sealy counterclaimed, seeking substantial damages and other relief.

The damage claims of the parties were tried before a jury over a period of four months in 1974 and 1975. Although both Sealy and Ohio had several objections to the jury's instructions, no complaint thereof is made on appeal. Ohio's evidence indicated damages on its complaint of $9,233,563 (before trebling, *see* Section 4 of the Clayton Act, 15 U.S.C. § 15). Sealy's counterclaim evidence indicated damages of $14,701,479. The jury rendered a general verdict for Ohio on its complaint, awarding damages of $6,814,852, and against Sealy on its counterclaim. Thereafter, the district court denied

Sealy's motion for judgment n. o. v., and denied its motion for a new trial conditionally on Ohio's accepting a remittitur of 50% of its $20,444,556 trebled damages. Ohio accepted the remittitur. After later hearings on equitable relief, the district court denied it. The court also ruled that Ohio was not entitled to interest on its judgment for the twenty-month period between the jury's verdict and the court's entry of final judgment in the case. Ohio appeals from the judgment's denial of equitable relief and interim period interest, and Sealy cross-appeals from the denial of its motions for judgment n. o. v. and for a new trial.

A fuller statement of the pertinent facts of the case will be given in the context of the issues presented for decision.

I. *Sealy's Motion for Judgment Notwithstanding the Verdict*

If Sealy is correct that the district court should have granted its motion for judgment n. o. v., most of the rest of the issues on appeal will be academic.[5] Accordingly, we consider this possibility first. In doing so, we are guided by the "well established" rule that

> a motion for a directed verdict or for judgment n. o. v. is properly denied where the evidence is such that reasonable men in a fair and impartial exercise of their judgment may draw different conclusions therefrom.

*Hannigan v. Sears, Roebuck and Co.,* 410 F.2d 285, 287 (7th Cir. 1969), *cert. denied,* 396 U.S. 902, 90 S.Ct. 214, 24 L.Ed.2d 178; *see also Fontana Aviation, Inc. v. Beech Aircraft Corporation,* 432 F.2d 1080, 1084

---

**3.** As pertinent, § 1 provides:

Every contract, combination . . . or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal . . . .

**4.** The district court in *Sealy* had found and enjoined a conspiracy to fix minimum retail prices, and no appeal was taken from its judgment order in that respect. While the Supreme Court pointed out the nexus between this price-fixing and the allocation of markets, 388 U.S. at 355–58, 87 S.Ct. 1847, it is clear that the latter element is illegal *per se* even though the former element is absent. *See id.* at 357 n.5, 87 S.Ct.

1847; *United States v. Topco Associates, Inc.,* 405 U.S. 596, 609 n.9, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972).

**5.** An exception would be Ohio's prayer for equitable relief. All of the elements of Ohio's complaint were in issue in the jury trial, so if there was insufficient evidence of antitrust violations to warrant submission of the case to the jury, equitable relief would obviously be foreclosed. If, on the other hand, judgment n. o. v. should have been granted on the ground that no recoverable damages were proved, equitable relief could nonetheless be appropriate.

(7th Cir. 1970), *cert. denied,* 401 U.S. 923, 91 S.Ct. 872, 27 L.Ed.2d 826 (1971). We are bound to view the evidence in the light most favorable to [Ohio] and to give it the benefit of all inferences which the evidence fairly supports, even though contrary inferences might reasonably be drawn.

*Continental Ore Co. v. Union Carbide & Carbon Corp.,* 370 U.S. 690, 696, 82 S.Ct. 1404, 1409, 8 L.Ed.2d 777 (1962) (footnote omitted); *accord, Hannigan, supra* at 288. This is particularly true in complex anti-trust cases such as this one "where motive and intent play leading roles," *Poller v. Columbia Broadcasting System, Inc.,* 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962), because "[f]indings as to the design, motive and intent with which men act depend peculiarly upon the credit given to witnesses" by the trier of fact. *United States v. Yellow Cab Co.,* 338 U.S. 338, 341, 70 S.Ct. 177, 179, 94 L.Ed. 150 (1949); *Lambert Corporation v. Evans,* 575 F.2d 132, 136 (7th Cir. 1978).

■ Ohio argues, as a threshold matter, that judgment n. o. v. was absolutely precluded by Sealy's failure to file a motion for directed verdict "at the close of all the evidence," which Rule 50(b), Fed.R.Civ.P., makes a necessary predicate of a later motion for judgment n. o. v. Sealy's directed verdict motion was made at the close of its case, *i. e.,* after all but certain rebuttal evidence was taken. The motion was not thereafter renewed, but we agree with the district court that Sealy adequately preserved its right to a ruling on the sufficiency of Ohio's evidence. The application of Rule 50(b) in any case "should be examined in the light of the accomplishment of [its] particular purpose as well as in the general context of securing a fair trial for all concerned in the quest for the truth." *Pittsburgh-Des Moines Steel Co. v. Brookhaven Manor Water Co.,* 532 F.2d 572, 576 (7th Cir. 1976); and *see* Rule 1, Fed.R.Civ.P.

Rule 50(b) serves the important purpose of ensuring that a motion for judgment n. o. v. is used only to invite the district court to reexamine its decision not to direct a verdict as a matter of law, and not, in contravention of the Seventh Amendment, to reexamine facts found by the jury. *Pittsburgh-Des Moines, supra* at 576. Where the court's attention is directed to a party's contention that the pertinent evidence presented entitles it to judgment as a matter of law, the motion's purpose is served. *Moran v. Raymond Corp.,* 484 F.2d 1008, 1014 (7th Cir. 1973), *cert. denied,* 415 U.S. 932, 94 S.Ct. 1445, 39 L.Ed.2d 490 (1974). Nor does the introduction of additional evidence after a directed verdict motion necessarily call for a different conclusion, especially where, as here, the district court expressly determines that "there was no probability that any evidence presented during rebuttal and/or surrebuttal could have prompted this Court to grant any motion for a directed verdict." *See Moran, supra* at 1012; *Gillentine v. McKeand,* 426 F.2d 717, 722 (1st Cir. 1970).

Another purpose of Rule 50(b) is avoidance of making a trap of a motion for judgment n. o. v. where, *e. g.,* a directed verdict motion would point out a defect in proof that the opposing party might remedy thereafter. *Pittsburgh-Des Moines, supra* at 576. There was no possibility of any such trap here, where the directed verdict motion came after both parties rested their cases in chief. Any additional proof which Ohio could properly introduce on rebuttal was in no way foreclosed, and no suggestion is made that the motion for judgment n. o. v. hinged in any material way on Ohio's lack of rebuttal evidence or Sealy's surrebuttal proof.[6] We conclude, as did the district court, that under this court's "liberal view of what constitutes a motion for directed verdict in deciding whether there was a sufficient prerequisite for the motion

---

**6.** Ohio argues that a trap was created, because Sealy agreed to instructions inconsistent with legal arguments made in this court. This argument, even if true, bears no relationship to the question under consideration. Rule 51, Fed.R. Civ.P., forecloses objections on appeal to agreed instructions and unless, as Sealy argues, the controlling law has clearly changed, Sealy can gain no advantage from the "trap" Ohio says it attempted to lay.

for judgment," *Moran, supra* at 1014, Sealy is entitled to have its attack on the sufficiency of Ohio's evidence heard on the merits.

### A. Market Allocation

The evidence in the case would clearly have allowed a jury to find the following facts with reference to Ohio's claim that Sealy was engaged in a scheme of market allocation. Soon after the Supreme Court's decision in *United States v. Sealy, Inc.*, Sealy's Board of Directors met to consider Sealy's future operations. Concern was expressed over the invalidation of the exclusive territory system, and the resulting dangers from the competition of "renegade," "out of control," "predatory" licensees, and from retailers which might attempt to play licensees off against each other to obtain lower prices. In conjunction with antitrust counsel, Sealy began the process of working out alternatives to preserve as much of the perceived benefit of its former system as the Department of Justice and the courts would allow in the light of the Supreme Court decision.

The final decree entered in *United States v. Sealy, Inc.*, 1967 Trade Cases ¶ 72,327 at 84,855 (N.D.Ill. Dec. 26, 1967), enjoined Sealy and its licensees from any arrangement "to limit or restrict any manufacturer in any substantial way to sales of Sealy products within a prescribed territory." *Id.* at 84,856. At the proceeding during which the decree was signed, John Sarbaugh, Chief of the Midwest Office of the Antitrust Division of the Department of Justice, made the following statement about the pertinent language of the decree:

> We do not interpret this language as prohibiting per se the employment of manufacturing location clauses, areas of primary responsibility clauses, or pass-over provisions. In so saying, we are in no way implying any view as to the legality of such clauses under the antitrust laws, nor, of course, are we suggesting that such clauses would not violate the decree if they have the effects proscribed by [its] language.

With this background, Sealy developed a new license agreement (including each of the provisions mentioned by Mr. Sarbaugh, and more) which was signed by all of Sealy's licensees, with one exception.[7] The new 1968 license agreement[8] maintained the same territories as had been used before, with Sealy promising not to license anyone else to manufacture Sealy products in a licensee's territory. The territories, however, were no longer to be exclusive as to sales. While each licensee was assigned primary responsibility to promote Sealy sales in his area, it also had the right to sell Sealy products in the territories of other licensees. Each licensee was to be held accountable for satisfactory performance in its area of primary responsibility (APR), and, as an incentive thereto, the contract provided that once the licensee achieved a certain sales quota in its APR, its royalties on all subsequent Sealy sales that year (inside or outside his APR) would be halved. Licensees were authorized to manufacture Sealy products only at the location(s) specified in their agreements and such additional locations as Sealy might thereafter approve in writing. Licensees were obliged to pay royalties on all products manufactured in licensed plants, whether or not the products were sold under a Sealy name. Products bearing the Sealy name, not surprisingly, were subject to higher royalty rates. In addition to the normal royalties, if a licensee sold Sealy products outside its APR it was subject to two additional charges. First, it would pay Sealy (and Sealy would thereafter pay the licensee whose APR was "invaded") pass-over payments equal to the

---

7. The southern California licensee successfully maintained a declaratory judgment action before the same district court judge who tried the present action, establishing that invalidation of the exclusive territory system did not nullify his prior contract in toto. *Sealy Mattress Co. of Southern California v. Sealy, Inc.*, 346 F.Supp. 353 (N.D.Ill.1972). Sealy thereafter acquired the licensee's business.

8. The agreement was revised in 1971 and subsequently without changes pertinent to the present discussion.

percentage of the out-of-APR sales corresponding to the invaded licensee's prior year advertising and promotion expenses divided by that licensee's total sales. The precise amount of pass-over payments could not be predicted in advance in any given instance, but testimony indicated the range of payments could be from 2.2% to 11%. An additional charge was made for product service repairs on out-of-APR sales, amounting to 1% at the time of trial.[9] Sealy was to have a right of first refusal should a licensee wish to sell its business. Licensees were forbidden to acquire any interest in any competitive organization, although this provision apparently would not preclude a licensee from manufacturing and selling competitive private brand merchandise through a subsidiary.

■ Ohio's theory of its case was that although many or all of the provisions to which we have just referred might be legal in and of themselves, they were designed and used by Sealy in *per se* violation of the Sherman Act to achieve a division of markets. In addition to receiving a Rule of Reason instruction pertaining to all aspects of Ohio's case, the jury was told that market allocation is *per se* illegal, and that the above restrictions were not themselves *per se* illegal unless used to achieve a market allocation, *i. e.,* to limit or restrict "in any substantial way, the geographic areas in which products may be sold." Because the jury awarded damages vastly in excess of those claimed for the other aspects of Ohio's case, it necessarily found that Sealy had allocated markets. Deferring for later consideration Sealy's arguments that the evidence shows no injury and no antitrust damages to Ohio, we think it plain that the district court did not err in allowing the jury to decide whether or not Sealy had illegally divided markets.

■ In assessing the evidence making a jury question of market allocation, we bear in mind the horizontal nature of the restraints involved. As we have pointed out,

the Supreme Court's decision in *United States v. Sealy, supra,* expressly held that the structure of the Sealy organization mandated the conclusion that its arrangements were horizontal ones. That structure, as pertinent, stands unchanged now. Sealy half-heartedly argues that the fact that it now itself manufactures and sells in certain territories introduces elements of verticality to the picture, but we cannot agree. Whatever may be said about the way Sealy conducts its business in those territories, it is indisputably clear that any restraints applied to the independent businesses which are licensees result directly from the concerted action of their horizontal potential competitors. Accordingly, as Sealy agreed by accepting the district court's instructions on market allocation, if Sealy's license agreement and its conduct thereunder amounted to substantial limitations on manufacturers' sales territories, a *per se* violation existed. *See Topco, supra; Sealy, supra; Timken Roller Bearing Co. v. United States,* 341 U.S. 593, 71 S.Ct. 971, 95 L.Ed. 1199 (1951); *United States v. National Lead Co.,* 332 U.S. 319, 67 S.Ct. 1634, 91 L.Ed. 2077 (1947); *Addyston Pipe & Steel Co. v. United States,* 175 U.S. 211, 20 S.Ct. 96, 44 L.Ed. 136 (1899).

■ We also emphasize that Sealy's approach to the alleged restraints misses the mark. Repeatedly, Sealy argues that, *e. g.,* areas of primary responsibility, exclusive manufacturing licenses, location clauses, pass-over payments, rights of first refusal, etc., have all been held at one time or another not to violate the antitrust laws. That is certainly true enough, but we know of no authority holding that these devices, alone or in conjunction, do not violate the antitrust laws *even though they have effects plainly within the ambit of those laws.* On the violation issue, Sealy consistently refuses to address what was obviously Ohio's case theory, on which the jury was appropriately instructed in agreed language. It is thoroughly established that

**9.** The 1968 contract had set the charge at 50 cents per piece on all mattresses and box springs sold outside the APR.

"[a]cts which may be legal and innocent in themselves, standing alone, lose that character when incorporated into a conspiracy to restrain trade." *Kurek v. Pleasure Driveway and Park District of Peoria,* 557 F.2d 580, 587 (7th Cir. 1977), *judgment vacated,* 435 U.S. 992, 98 S.Ct. 1642, 56 L.Ed.2d 81 (1978), *judgment reinstated,* 574 F.2d 892 (7th Cir. 1978) (per curiam); *see Simpson v. Union Oil Co. of California,* 377 U.S. 13, 84 S.Ct. 1051, 12 L.Ed.2d 98 (1964); *Poller v. Columbia Broadcasting System, Inc., supra,* 368 U.S. at 468–69, 82 S.Ct. 486. Moreover, in antitrust cases

> plaintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each. "The character and effect of a conspiracy are not be judge by dismembering it and viewing its separate parts, but only by looking at it as a whole."

*Continental Ore Co. v. Union Carbide & Carbon Corp., supra,* 370 U.S. at 699, 82 S.Ct. at 1410 (citation omitted).

Ohio proved that the mattress business is substantially local in nature, because of the bulk and weight of the product, the fact that retailers typically do not care to warehouse the product, and the need for frequent customer sales calls. As Sealy concedes, the great majority of mattress sales are made within 200–300 miles of a manufacturing plant. Exclusive manufacturing territories in the mattress industry thus tend to have the effect of limiting to some degree the areas in which any licensee can effectively compete. The jury was not instructed, however, that this effect alone would suffice to constitute an antitrust violation, and, indeed, Ohio does not attack Sealy's exclusive manufacturing area system, except in those limited cases where a significant market is left inadequately served by a licensee's refusal to locate a plant in proximity thereto.[10]

The local nature of the mattress business and the exclusive manufacturing areas used by Sealy really do little more than set the stage for the balance of the restraints attacked. Any licensee could, e. g., engage in significant intrabrand competition at least with his neighboring licensees if Sealy's restraints went no further. But Sealy did go further, as we have said. It limited its licensees to manufacturing at specified locations. While no one from Sealy squarely admitted it, the jury could have found from Ohio's evidence that the purpose of this provision—which did not exist at the time of the Supreme Court's decision—was to prevent aggressive licensees like Ohio from locating plants near the periphery of their APR's, from whence they could compete effectively against neighboring licensees. The evidence also supported the conclusion that Sealy used the clause against Ohio in 1970 and 1973 to achieve exactly that purpose, when Ohio twice sought permission to locate a plant at Toledo, and Sealy twice denied it, at least partly in order to protect the interests of the Detroit licensee.

The degree to which Sealy licensees could effectively compete with each other from their fixed central locations was necessarily reduced by the charges Sealy imposed on out-of-APR sales. Taking the less onerous charge first, Sealy required licensees to pay 1% of out-of-APR sales to cover product service repairs made by "invaded" licensees. Although the original conception of this charge involved its being paid to Sealy to hold in a fund from which to compensate licensees who actually provided such repairs, in execution the charge was paid over to "invaded" licensees whether or not they ever repaired a single mattress. Ohio's evidence indicated that any such repairs were typically made by the selling licensee, and Sealy's president admitted that quality control on Sealy products was so good there were seldom product service repairs required, and that he saw little legitimate purpose in the 1% charge. The jury could have found it exacted a 1% tax on exercise

---

10. Evidence indicated that the St. Louis market, currently served by the Memphis licensee from a plant in Memphis, is such an instance.

of the "right" to sell outside a licensee's APR.

Sealy also imposed pass-over payments, supposedly designed to prevent an out-of-territory licensee from taking a "free ride" on an APR licensee's efforts and expenses to develop the Sealy name in its APR. Like the product service repair charge, pass-over payments have a plausible theoretical justification. The jury could nonetheless have found from the evidence that the payments unjustifiably served as a barrier to intrabrand competition. Ohio's economic expert, Dr. Willard F. Mueller of the University of Wisconsin, formerly and for many years the Chief Economist and later the Chief of the Bureau of Economics at the Federal Trade Commission, told the jury that the function of developing consumer preference for Sealy products was almost exclusively performed by Sealy's national advertising program, and that local advertising was designed primarily to increase local sales. A prime example of the type of advertising expense incurred locally was a cooperative advertising program for retailers, who ran local newspaper advertisements to attract customers to a bedding sale, very possibly featuring other brands as well as Sealy products. Even if there were some "free rider" effect from such advertising, the jury could easily have found that compensating an "invaded" licensee to the full proportionate extent of all his advertising and promotion expenses went much further than needed for the limited articulated purpose. The possible dampening effects on competition of pass-over payments that could run as high as 11% must have been obvious to the jury. Dr. Mueller testified that in fact the pass-over payments and the product service repair charges created barriers that made it very difficult to compete effectively outside the APR. He also testified that the expectation derived from his substantial experience would have been that significant intrabrand competition would have developed after the Supreme Court invalidated Sealy's exclusive territories, but that no significant amount of such competition existed.[11]

As we have indicated, Sealy inserted in its license agreements a provision giving it a right of first refusal before a licensee sold its business. Once again, this is a contract term inoffensive in itself, that the jury, however, could have found to have been used to perpetuate enclaves relatively free from intrabrand competition. Sealy had a right to veto a proposed sale of a licensee's business on objective business grounds, but it never invoked that provision when Ohio sought to acquire another licensee's business, because Ohio is obviously a well-qualified licensee. Instead, although the right of first refusal had never been exercised against anyone else, it was exercised five times against Ohio. In late 1970 and early 1971, Ohio contracted to acquire the Philadelphia licensee. After the neighboring Baltimore licensee (a member of Sealy's Board of Directors, and of the Board's Executive Committee) complained, Sealy exercised its right of first refusal, and the Philadelphia licensee withdrew the business from sale, as was its right. In 1972, the scenario was repeated, but this time Sealy succeeded in acquiring the business. In mid-1970, Ohio sought to acquire the Florida licensee, Sealy announced its intention to exercise its

11. Indeed, as much as Sealy emphasizes its figures on the amount of sales out-of-APR to show that such sales were in fact quite possible, the figures do not contradict Dr. Mueller's conclusions. Between 1969 and the first six months of 1976, Ohio did make millions of dollars of out-of-APR sales, but the record would amply support the conclusion that Ohio was the kind of licensee that was likely to make the best of even a very restrictive situation. The fact that Ohio overcame the obstacles to some degree in no way proves that it was not significantly impeded in making even more sales in intrabrand competition. More-over, analysis of out-of-APR sales by licensees other than Ohio is quite telling. Notwithstanding that in at least one extended market area, the densely populated northeast, there are many city markets within less than 200 miles of numerous licensees' plants, less than .0042 of Sealy sales were made in the 1969–1976 period out-of-APR. Although, as Sealy points out, there appears to be a trend to increased amounts of such sales, the pertinent figures for 1974, 1975, and the first six months of 1976 were only: less than .009, less than .012, and approximately .007, respectively.

right of first refusal (after complaint by a neighboring licensee director), and the business was withdrawn from sale. In 1972, Ohio again sought the Florida business. Despite feelings that the price was too high, Sealy blocked Ohio's efforts to acquire the Pittsburgh licensee and acquired it for itself. In all three instances, the businesses acquired have lost money since Sealy bought them.

To be sure, Sealy had a more legitimate explanation of its exercises of the right of first refusal. It took the position at trial that the Supreme Court decision spurred bona fide interest in reconstituting Sealy as a national integrated vertical manufacturer/distributor of bedding.[12] (The Court had distinguished *White Motor Co. v. United States,* 372 U.S. 253, 83 S.Ct. 696, 9 L.Ed.2d 738 (1963), where it held that vertically imposed territorial limits were not subject to the *per se* rule, 388 U.S. at 354, 87 S.Ct. 1847; and see *Continental T. V., Inc. v. GTE Sylvania, Inc.,* 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977), and such limits practiced by a vertically integrated supplier would seem to be an *a fortiori* case if, indeed, the threshold requirement of a combination or conspiracy could somehow be met in such a case.) The short answer to this theory is that Ohio introduced evidence that a desire to stop Ohio from intrabrand competition was the true reason for Sealy's acquisitions, *e. g.,* that influential neighboring licensees complained, that Sealy paid a price it considered too high for Florida, and that it persisted in acquiring licensees Ohio sought to buy despite the fact Sealy could not operate them profitably. The choice between the conflicting evidence and the differing inferences was for the jury, not for the district court in considering Sealy's motion for judgment n. o. v., and not for us in reading a cold record on appeal.

Sealy advances one additional argument on the issue of a market allocation violation that we believe deserves brief attention. Although Sealy agreed to the district court's *per se* allocation instruction, it argues now that the Rule of Reason was the only possible basis of its liability and that Ohio did not satisfy the rule Sealy says that its acquiescence in the *per se* instruction does not bar this argument because it does not seek reversal on the basis of improper instructions, see Fed.R.Civ.P. 51, but rather asserts that under the law truly and properly applicable to the case Ohio's case should never have been submitted to the jury. It insists that this is particularly true where the law has changed after the trial, because an appellate court is bound to render decision on the issues before it on the basis of currently applicable law. As Sealy's argument derives from *Continental T. V., Inc. v. GTE Sylvania, Inc., supra,* decided after final judgment was rendered below, we agree that the argument should be considered, see *Bradley v. School Board of the City of Richmond,* 416 U.S. 696, 711, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974), but we reject it on the merits.

*Sylvania* overruled *United States v. Arnold, Schwinn & Co.,* 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967), and held, as had the *White Motor* case, *supra,* decided only four years before *Schwinn,* that *vertically-imposed* territorial limitations must be judged not by a *per se* rule but by the Rule of Reason. Because the Court in *Sylvania* expressly reaffirmed the appropriateness of the *per se* rule for horizontal territorial limits, 433 U.S. at 58, n.28, 97 S.Ct. 2549, it is difficult to see how the decision advances Sealy's argument.[13] It insists nonetheless

---

12. Sealy's position derived some evidentiary support from proof that Sealy explored the possibilities of vertical integration with two different business consulting firms, and that Sealy and a number of its licensees entered a valuation program conducted by one of the consulting firms to appraise the licensees' businesses. Ohio took the position that the program, with its corollary restriction that no participating licensee could sell its business during the course of the valuations, was at least in part a move to limit intrabrand competition by removing licensees from the acquisitions market in which Ohio was interested.

13. We are aware of no authority interpreting *Sylvania* as having any pertinence to horizontal restraints such as those at bar. *Newberry v. Washington Post Company,* 438 F.Supp. 470, 474 n.5 (D.D.C.1977); *Evanston Motor Company, Inc. v. Mid-Southern Toyota Distributors,*

that the very premise of the *Sylvania* decision is that restrictions on intrabrand competition may promote interbrand competition, thus making it impossible to say that such restraints have the requisite "manifestly anticompetitive" nature to justify a *per se* rule of illegality. *Id.* at 50, 97 S.Ct. 2549; and *see Northern Pacific Railway v. United States,* 356 U.S. 1, 5, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958). In *United States v. Topco Associates, Inc., supra,* however, the Court rejected exactly this argument in the context of horizontal restraints, 405 U.S. at 610–11, 92 S.Ct. 1126, and the *Sylvania* decision expressly reaffirmed that rejection. 433 U.S. at 57, n.27, 97 S.Ct. 2549. A horizontal agreement among potential competitors to develop a national brand and not to compete with each other in selling it is, we think, considerably more suspect than limitations imposed by a single independent manufacturer on its distributors as a condition of their distributorships, but even if we were inclined to agree with Sealy's arguments to the contrary, we believe the Supreme Court has foreclosed that approach. Moreover, had we accepted Sealy's argument that only the Rule of Reason could be applied, we would be unable to agree that Ohio failed to make out a jury case under that rule. Dr. Mueller testified, *e. g.,* that the national mattress industry was heavily concentrated and the market was heavily conditioned to acceptance of major brand names, and that, accordingly, an increase in intrabrand competition—in this industry at least—would also promote increased interbrand competition.

█ We now turn to Sealy's contentions that Ohio demonstrated no antitrust injury and no antitrust damages compensable under Section 4 of the Clayton Act, 15 U.S.C. § 15. Section 4 provides treble damages to "[a]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws . . . ."

*Inc.,* 436 F.Supp. 1370, 1372–73 (N.D.Ill.1977); and *Pitchford Scientific Instruments Corporation v. Pepi, Inc.,* 435 F.Supp. 685, 688 (W.D. Pa.1977), all recognize the lack of such pertinence, and Sealy has not suggest that there are any cases to the contrary.

After final judgment herein, the Supreme Court decided *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977), an important case in the interpretation of Section 4, and one on which Sealy heavily relies.

In *Brunswick,* a large national producer of bowling equipment had acquired numerous bowling alleys that had defaulted in their debts to the producer. It was conceded before the Court that the acquisitions violated Section 7 of the Clayton Act, 15 U.S.C. § 18, in that they might substantially lessen competition or tend to create a monopoly, and that but for the acquisitions, the alleys would have failed. Plaintiffs were operators of bowling alleys competing with those acquired by Brunswick, which established that they would have gained larger market shares and profits had Brunswick not acquired its alleys and kept them in business. The Court held that plaintiffs were foreclosed as a matter of law from recovering the profits thus lost, despite the causal link between the lost profits and the antitrust violation. More was required, specifically a nexus between the recovery sought and the purposes of the antitrust laws. In *Brunswick,* a Section 7 violation existed only because a "deep pocket" giant was entering a market of "pygmies." 429 U.S. at 487, 97 S.Ct. 690. Yet if the failing alleys had acquired refinancing or been purchased by "shallow pocket" firms, plaintiffs would have suffered the same loss, despite the absence of a Section 7 violation. Similarly, if the alleys had been prosperous, Brunswick's acquisition would have been at least as illegal, yet plaintiffs would have suffered no loss. *Id.* As the Court pointed out, plaintiffs were really seeking damages for loss caused by fair competition, in total perversion of the purposes of the antitrust laws.[14] As the Court summarized the teachings of its *Brunswick* decision:

14. The Court emphasized that a very different case would have been presented had plaintiffs shown that Brunswick had abused its deep pocket by engaging in, *e. g.,* predatory conduct injuring plaintiffs, but plaintiffs made out no such case.

832

Plaintiffs must prove *antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.

*Id.* at 489, 97 S.Ct. at 697 (emphasis in original). Sealy argues here that Ohio totally fails to meet that standard.

At the outset, we note that Sealy's argument goes too far. To justify judgment n. o. v. even with respect to the market allocation theory to which the *Brunswick* argument is addressed, Sealy would have to demonstrate that absolutely no antitrust injury was evidenced at trial. That cannot be said here. To take but one example, the jury was entitled to find that pass-over payments and product service repair charges were parts of a plan of market allocation, and Ohio introduced evidence of nearly $170,000 paid to Sealy thereunder. We do not believe an argument can be made that a tax on intrabrand competition is not the type of injury the antitrust laws were intended to prevent or that it does not flow from that which makes a market allocation scheme illegal. Nonetheless, if Sealy is correct that Ohio's lost profit damages resulting from Sealy's acquisition of the Florida, Pittsburgh, and Philadelphia licensees are not compensation for antitrust injury, a new trial would be required because the amount of damages awarded by the jury established as a mathematical certainty that compensation for those lost profits was a part of the jury's verdict.[15]

The thrust of Sealy's argument is that the competitive situation would have been the same regardless of whether the prior licensee, Ohio, or Sealy had primary responsibility for the territories in question.[16] It insists that Ohio is merely a disappointed desirous purchaser of the licensees, and that to award damages for the disappointment is a perversion of the antitrust laws. If Ohio had claimed damages here on the theory that, *e. g.,* Sealy's acquisitions in themselves violated Section 7 of the Clayton Act, Sealy's argument might have some plausibility. Sealy ignores, however, the theory Ohio argued to the jury and on which the district court gave instructions, that Sealy's exercise of its right of first refusal was a part of a scheme of market allocation, done to keep Ohio from establishing new bases from which it might effectively compete with neighboring licensees. Evidence indicated that had Ohio acquired the territories, its policy of competing across the borders of its APR's would have produced significant intrabrand competition that did not occur under Sealy's management of the territories. Moreover, there was evidence that within the APR's themselves, Sealy would have been a more efficient producer and more effective interbrand competitor. While Sealy would not presumably have blocked Ohio's attempted acquisitions for the purpose of limiting effective inside-APR interbrand competition, evidence indicated that a loss of that competition may have been a price Sealy was willing to pay to achieve the primary purpose of maintaining territorial restraint.

There was, in other words, evidence of an illegal scheme to divide markets, intention-

**15.** As we have noted, Ohio claimed a total of $9,233,563 in damages, of which $6,436,995 represented profits lost by the lost acquisitions. The jury's verdict awarded $6,814,852.

**16.** Sealy hypothesizes that if an outside buyer had simply outbid Ohio in its attempts to acquire the licensees, there would have been the same loss to Ohio without any antitrust violation. This argument has the appeal of superficial similarity to an example used by the Court in *Brunswick. See* discussion *supra.* But the point the Court was making there—that there was no nexus between the injury claimed and the purposes of the antitrust laws—simply cannot be made here, for reasons discussed *infra.* The incorrectness of lifting the example from the *Brunswick* opinion and attempting to generalize it without regard to its context can be quickly demonstrated by an example: if General Motors, on its own and for bona fide and unassailable business reasons chose to stop supplying one of its dealers with automobiles, there would be no antitrust violation, yet the loss to the dealer would be identical to that which would result if all the neighboring dealers had pressured GM to cease supply in order to reduce intrabrand competition. We doubt that even Sealy would argue that the loss in the latter instance would not be antitrust injury. *See United States v. General Motors Corp.,* 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966).

ally effectuated against Ohio by means of Sealy's acquisitions, resulting in harms both to intrabrand and interbrand competition because Ohio's contracts to acquire the licensees were frustrated.[17] We believe the profits lost thereby do reflect injury of a type the antitrust laws were intended to prevent and do flow directly from the anticompetitive scheme that made Sealy's acquisitions illegal. Obviously, to the degree the profits Ohio would have made might include profits that a poor interbrand competitor committed to avoiding intrabrand competition could also have made,[18] they do not totally reflect an actual harm to market competition. But as the Court made clear in *Klor's, Inc. v. Broadway-Hale Stores, Inc.,* 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959), and *Radiant Burners, Inc. v. Peoples Gas Light & Coke Co.,* 364 U.S. 656, 81 S.Ct. 365, 5 L.Ed.2d 358 (1961) (per curiam), private antitrust suits need not be premised on actual diminutions in market competition, so long as they involve anticompetitive conduct aimed at the plaintiff. The refinement made in *Brunswick* is simply that the injury claimed "should, in short, be 'the type of loss that the claimed violations . . . would be likely to

cause.' *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S., at 125, 89 S.Ct. 1562." 429 U.S. at 489, 97 S.Ct. at 697 (footnote omitted). That test is amply met here.

### B. Tying and Price-Fixing of Mattress Components

It is undisputed that Sealy required its licensees to manufacture Sealy products in accordance with certain specifications. The specifications required use in mattress foundations of a torsion bar element called a Posturegrid, which is a patented product of the Universal Wire Spring Company. Sealy also insisted that certain other specified components be purchased from designated approved suppliers. Mattress springs are the component primarily in issue here. Sealy had three subsidiaries that manufactured spring units and that were at all pertinent times approved suppliers.[19] Evidence established without dispute that Universal Wire and approved spring manufacturers paid to Sealy a charge of from three to five percent of their sales to the licensees, unbeknownst to the licensees. The jury could have found that the charge was in the nature of a payment for the privilege of being a supplier to Sealy licensees, akin

17. Sealy advances the related argument that Ohio's losses were not caused by the right of first refusal or its exercise, but merely by Ohio's decision not to make higher bids than Sealy was willing to match. We wholly disagree. The jury was properly instructed that it would be sufficient to establish causation if the jury found antitrust violations to be material factors in causing loss. *See Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 114 n.9, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969). We note that there was no evidence indicating that Ohio had the power to force a licensee desirous of selling his business to withdraw the business from sale to Sealy once the right of first refusal was exercised. Indeed, the thrust of Sealy's counterclaim, rejected by the jury, was that Ohio committed grievous wrong by the role it may have played in even *encouraging* selling licensees to withdraw their business from sale at the time of Sealy's attempted exercise of the right. Moreover, in both Florida and Philadelphia, Ohio did up the ante significantly, only to have Sealy (which had not expressed previous interest in acquiring either licensee) match the higher offer, even though at least in the case of Florida, Sealy considered the price paid too high. The jury could surely have found that

the market allocation scheme was in fact the cause of Sealy's exercise of the right of first refusal.

18. We emphasize that it is by no means clear that the profits Ohio would have made in the territories would not have been entirely attributable to increased intrabrand and interbrand competition. Sealy, after all, a demonstrably less effective interbrand competitor which, perhaps understandably, made no significant intrabrand sales in the territories, *lost money* on the territories acquired to block Ohio's expansion. We note here, in passing, that Sealy does not attack the method used by Ohio to estimate its lost profits, applying a representative Ohioplant profit margin to the sales actually made in the territories after Sealy acquired them. *Cf. Zenith Radio Corp. v. Hazeltine Research, Inc., supra,* 395 U.S. at 116–17, 89 S.Ct. 1562.

19. Sealy Spring Corporation—Indiana was the only subsidiary in existence throughout the entire damage period, but Sealy Spring Corporation—East and Sealy Spring Corporation—West were approved suppliers from their inception through the end of the period.

to a commission to Sealy for purchases it forced its licensees to make.[20] There was also evidence that prices for Posturegrid assemblies and spring units under this system were significantly higher than for comparable products available in the market. Sealy's chairman, indeed, admitted that something of a "captive market" existed for spring units for Sealy products. Ohio also introduced evidence that during the late 1960's, Sealy's original spring manufacturing subsidiary (in Rensselaer, Indiana) agreed with the only other manufacturer then approved to supply Sealy licensees that the two firms would set the same prices.

We agree with Ohio and the district court that it was proper to send Ohio's components claims to the jury. "[A] tying arrangement may be defined as an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product . . . ." *Northern Pacific Railway Co. v. United States, supra,* 356 U.S. at 5, 78 S.Ct. at 518. Because they deny competitive access to the tied product market on the basis of the seller's leverage in the tying product market, and force buyers to forego free choice between sellers, such arrangements

> are unreasonable in and of themselves whenever a party has sufficient economic power with respect to the tying product to appreciably restrain free competition in the market for the tied product and a "not insubstantial" amount of commerce is affected.

*Id.* at 6, 78 S.Ct. at 518 (citations omitted); *Fortner Enterprises, Inc. v. United States*

*Steel Corp.,* 394 U.S. 495, 498–99, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969).

Sealy, as we have said, does not dispute that it conditions the license of its trademarks on the licensee's use of specified components from designated suppliers. Nor does it deny that its unique and legally protected trademarks, *see United States Steel Corp. v. Fortner Enterprises, Inc.,* 429 U.S. 610, 619, 621, 97 S.Ct. 861, 51 L.Ed.2d 80 (1977), which have achieved substantial consumer acceptance, create sufficient power to allow it to restrain competition in the market for the components, or that a substantial volume of commerce is affected.[21] Sealy does argue, nonetheless, that the challenged practices are not of the type properly condemned as tying arrangements.

With reference to the Posturegrid specification, Sealy points out that the Universal product was patented and argues that it was the legal patent monopoly that foreclosed competitors' access to Sealy licensees. This assertion unfortunately misses the thrust of Ohio's claim, that Sealy wrongfully mandated use of the Posturegrid and gained hidden rebates thereby, at the expense of the licensees.[22] We quite agree with Ohio that a patented product, like any other, may be illegally tied. "The antitrust laws do not permit a compounding of the statutorily conferred monopoly." *United States v. Loew's, Inc.,* 371 U.S. 38, 52, 83 S.Ct. 97, 105, 9 L.Ed.2d 11 (1962).

Sealy also insists that the vice condemned in the tying cases simply cannot be found where a trademark licensor specifies the patented products of a third company for use by its licensees, because the licensor,

---

**20.** Sealy's Vice President at one time wrote a letter to the President of an approved spring supplier, referring to the charge as a royalty for the privilege of supplying Sealy licensees. Although Sealy's trial witnesses attempted to characterize the charge as compensation to Sealy for its quality control inspection program for suppliers, officials of Sealy had prior to 1971 frequently referred to the charge as a royalty, a commission, or a load charge. Sealy also had at one time, extending into the damage period pertinent to this case, received rebates on mattress ticking supplied to licensees, such rebates being justified only by a desire for

revenues for Sealy. Sealy does not argue on appeal that the jury was obligated to accept the quality control service charge characterization.

**21.** Ohio's purchases alone of the allegedly tied components amounted to approximately $9.6 million during the pertinent period, and the entire Sealy organization obviously purchased many times this amount.

**22.** Ohio introduced evidence that it would have purchased comparable items elsewhere (given the premium price Universal was charging) but for the mandatory specification.

whatever the power conferred by his trademark's value, cannot be said to be using it to invade a second market. We agree that there is no illegal tying arrangement where a "tying" company has absolutely no financial interest in the sales of a third company whose products are favored by the tie-in. *Crawford Transport Company v. Chrysler Corporation*, 338 F.2d 934 (6th Cir. 1964), *cert. denied*, 380 U.S. 954, 85 S.Ct. 1088, 13 L.Ed.2d 971 (1965); *Keener v. Sizzler Family Steak Houses*, 1977–2 Trade Cases ¶ 61,- 682 at 72,800 (N.D.Tex.1977); *Rodrigue v. Chrysler Corporation*, 421 F.Supp. 903 (E.D. La.1976). Here, however, it is undisputed that Sealy received substantial rebates from Universal on sales to the licensees, and, moreover, that those rebates were concealed from the licensees. The concealment aspect alone might have justified a jury's decision to disbelieve Sealy's claim that the payments made to Sealy were not in return for the specification of Universal's product as mandatory Sealy components. In addition, the asserted justification for the payments was that they were compensation for Sealy's technical efforts in helping Universal adapt its torsion bar concept to the mattress industry. Yet Sealy's President admitted that Universal had prior to dealing with Sealy applied the concept to the mattress industry (though an improvement was still needed at the time), and, as was brought out at trial, the written agreement between Sealy and Universal made no reference to Sealy's provision of technical assistance, though it did state that Universal was to provide technical assistance to Sealy. Sealy's third argument on the Posturegrid units, that the specification was not shown to be other than a bona fide decision on the basis of product merit by a trademark owner to protect the essential characteristics of the trademarked product, may be disposed of briefly. The jury could have found from the evidence we have discussed that Sealy forced the use of the Posturegrid and was paid handsomely by Universal simply for

creating a captive market in which it could and did charge a premium price. Even if the Posturegrid was a superior product, such an arrangement was unlawful. *See Osborn v. Sinclair Refining Co.*, 286 F.2d 832 (4th Cir. 1960), *cert. denied*, 366 U.S. 963, 81 S.Ct. 1924, 6 L.Ed.2d 1255 (1961), a case very similar to this one.

Regarding mattress spring units, Sealy takes the position that an essential element of a tying case is proof of actual foreclosure of competition. It cites *Fortner Enterprises, Inc. v. United States Steel Corp.*, 523 F.2d 961, 967 (6th Cir. 1975), *rev'd, United States Steel Corp. v. Fortner Enterprises, Inc., supra; Coniglio v. Highwood Services, Inc.*, 495 F.2d 1286 (2d Cir.), *cert. denied*, 419 U.S. 1022, 95 S.Ct. 498, 42 L.Ed.2d 296 (1974); and *Driskill v. Dallas Cowboys Football Club, Inc.*, 498 F.2d 321 (5th Cir. 1974), to support this proposition, and says that Ohio has failed to introduce the requisite proof. Because the Supreme Court has repeatedly held that tying, if it fits within the *Northern Pacific* standard, is a *per se* violation, we are not free to inquire whether such tying in any given case injures market competition. Sealy's argument, however, is somewhat more subtle than that, and we agree that if a given tying arrangement has no potential to foreclose access to the tied product market, it does not exemplify the vice that led the Court to declare tying a *per se* offense. *Coniglio* and *Driskill* amply illustrate the proper bounds of the actual foreclosure rule.[23] In these cases, the practices of two National Football League clubs of requiring season ticket buyers to purchase preseason exhibition game tickets in the same package were attacked as illegal tie-ins. Because both clubs had a complete monopoly, however, in the tied as well as the tying market, *there could be no foreclosure* of competitive access to the tied market resulting from the tie-in. If the same thing could be said here, Sealy would have been entitled to a directed verdict on mattress spring tying.[24]

---

**23.** The Sixth Circuit's *Fortner* opinion cited *Coniglio* and *Driskill* as recognizing an actual foreclosure requirement, but declined to apply it as a bar to the case before it.

**24.** Because the jury may have awarded some damages flowing from the tie-in, Sealy, under *Coniglio* and *Driskill*, would be entitled either to a new trial, or to a remittitur of the full

836

We think there was clearly a jury question on foreclosure during the pertinent period, however. Only approved manufacturers could supply Sealy licensees. Sealy's own subsidiaries were always approved. Prior to 1972 (when Sealy obtained patents on the then-specified spring units) only two other firms were approved, the Steadley Company from which Ohio purchased and a west coast firm referred to as Laisco. Both firms paid, as the jury could have found, a commission to Sealy for the privilege of supplying Sealy licensees. *See Osborn, supra.* The Steadley Company was induced to agree to base its prices for specified units on those charged by Sealy's manufacturing subsidiary.[25] The jury was entitled to infer that no firm which would not play the game by these rules would win Sealy's approval as a supplier. In this context, Sealy's statement that there was no evidence it ever denied supplier approval carries much less weight than might otherwise be the case. Moreover, the jury could have concluded Sealy attempted to force Steadley and Laisco out of the suppliers' market. In 1970, Sealy developed new specifications which it thought patentable, and applied for a patent thereon. Although Sealy now cites its licensing of a supplier under the patent, after it issued in 1972, as evidence of its magnanimity and of lack of foreclosure, Sealy advised both Steadley and Laisco in 1970 that if a patent issued no one would be licensed thereunder. Thus even if Steadley withdrew from supplying Sealy springs in late 1970 because of a lack of desire to incur tooling costs that would not be recoverable over a reasonable amortization period if the patent issued, the jury could have concluded that Sealy used the no-license threat to drive Steadley out of the market during the interim period. (When Steadley did withdraw, only Sealy's subsidiary was left in the captor selling market created by the specifications.) Furthermore, Steadley asked for the specifications for the new system so that it could tool up to produce the new springs, or at least consider doing so, and Sealy refused to provide them. Thus it is not even clear Steadley would not have been willing to be a supplier in the interim period. There was also evidence to support the conclusion that Sealy used its quality control inspection and approval powers to force Steadley out of the market. Sealy's President at one point in 1970 wrote to its Vice President suggesting that Sealy ought to consider continuing to allow Steadley to manufacture approved products (despite alleged quality control problems) as a bargaining tool to avoid problems from Steadley regarding the proposed change of specifications that would put Steadley out of the business of supplying Sealy licensees.[26]

## C. The National Accounts Agreement

■ To deal with potential customers such as Montgomery Ward & Co., Sears, Roebuck & Co., and J.C. Penney Co., which sell bedding at many retail outlets throughout the country, Sealy developed its national accounts program,[27] which was originally embodied in a separate agreement but which is now a part of Sealy's license agreements. Under this program, Sealy ap-

amount of damages claimed from tying to eliminate the possibility it was prejudiced by submitting the claim to the jury. *See Durant v. Surety Homes Corporation*, No. 77–2045, 582 F.2d 1081 (7th Cir. August 8, 1978). The possibility also exists that the district court's remittitur of half of the jury verdict, if erroneously offered as an alternative to a new trial, would render harmless the submission of the tying theory to the jury. *See* discussion *infra.*

25. Sealy's attack on the sufficiency of the evidence to prove this point is without merit. Evidence indicated not only identity of actual prices charged but also an express agreement to fix prices. That Sealy's officials denied the agreement, or that Ohio could not prove the

agreement continued to any definite ending date, would not have justified taking the question from the jury.

26. Sealy's attack on the sufficiency of the evidence to make a jury question of Ohio's theory of monopolization of Posturepedic springs is based entirely on the no-foreclosure argument which we have just rejected. Accordingly, we reject the argument in this context as well.

27. It is a matter of some historical irony, if no great substantive significance, that the program was devised by a committee chaired by E.M. Wuliger, the President of Ohio.

proached the national accounts directly and attempted to negotiate agreement to supply both Sealy-brand products and private label products according to agreed specifications and at agreed prices. Once agreement was reached, each Sealy licensee was given the opportunity to participate in the program for the particular national account involved. Participation, we emphasize, was wholly voluntary. Any licensee was free not to participate, and to negotiate directly with the customer in an attempt to supply all or any part of the customer's needs. (Sealy has not had exclusive dealing contracts with any national account.) Even though a licensee might originally elect to participate, it was perfectly at liberty at any time to withdraw from the program and to begin negotiations with the customer.[28] While a licensee was in the program, however, it was obliged to supply the customer's outlets in its APR with the specified products at the agreed price. The customer was not prevented from specifying that it wanted deliveries to any given outlet made by a licensee which did not have primary responsibility for the territory in which the outlet was located. This in fact did occur from time to time.

Sealy's primary national account was Montgomery Ward & Co. (Ward's). The furniture merchandise manager for Ward's testified that his company had committed itself to a policy of purchasing from firms that could serve Ward's needs nationally, because of the efficiency, simplicity, and flexibility available in dealing with a single source of supply.[29] He also testified that if Sealy eliminated the national accounts pro-

gram, Ward's would turn to other national suppliers to meet its needs and would not return to its earlier "chaotic" practice of purchasing from many manufacturers. This testimony was undisputed. Sealy officials testified that the existence of such attitudes among national account customers was the reason for the program Ohio attacks, and this testimony also was never seriously challenged.

Ohio participated in the national accounts program until 1974, at which time it withdrew. Since that time, Ohio has vigorously sought to capture a significant part of Ward's business, offering lower prices than those provided by the Sealy-Ward's contract. As we have noted, Ohio is an efficient high quality manufacturer. Nonetheless, Ohio has not been successful in garnering Ward's business, because of Ward's preference for dealing with a national supplier. Asserting the illegality of the national accounts program, Ohio sought $106,766 in damages for sales it alleged it would have made to Ward's (and to J.C. Penney, in a much smaller amount) but for the program.[30]

We have concluded that the district court should have directed a verdict in Sealy's favor on this claim. First, as Sealy points out, the profits lost from sales to Ward's resulted from Ohio's purely voluntary choice to compete for the business on its own, not from any illegality that arguably might have infected the national accounts program. Both causation and *Brunswick, supra,* problems pose insurmountable obstacles to the recovery sought.

**28.** The sole limitation on the right to withdraw was that a licensee was obliged to fill orders under the program for a six month transition period. No claim is made that this provision is illegal.

**29.** Ohio repeatedly emphasizes that Ward's does not in fact deal with a single supplier of mattresses. It is true that Ward's has separate national suppliers of foam and innerspring mattresses, and that in a few isolated instances Ward's is obliged by circumstances to meet its needs locally. There is even one market area where Ward's agreed, in response to appeals from community leaders, to purchase mattress-

es from a local firm as part of a program to shore up the depressed economy in the market area. The essential fact, however, stands undisputed in the record: Ward's does have a policy of buying from a single source of supply, albeit that policy is subject to rare exceptions.

**30.** Ohio also claimed $294,915 in damages for royalties paid to Sealy for goods not bearing Sealy-brand labels. Over 97% of these royalties derived from sales to Ward's while Ohio was in the national accounts program, but the rationale for these damages is analytically distinct and we consider this claim hereinafter.

Second, and more fundamentally, we are unable to perceive how a jury could have found the national accounts program to be illegal. It is clear that a joint selling agency is not *per se* violative of the antitrust laws. In *Appalachian Coals, Inc. v. United States,* 288 U.S. 344, 53 S.Ct. 471, 77 L.Ed. 825 (1933), the Supreme Court applied the Rule of Reason to, and ultimately approved, an arrangement by which 12% of the coal suppliers in a given region sold all their coal to all buyers through a joint agent. The Court did so notwithstanding a finding, which it did not overturn, that prices for coal would rise as a result of the arrangement, because the economic circumstances extant made the arrangement reasonable, and demonstrated that real competition would continue to exist in the market. The case before us would appear to follow *a fortiori* from *Appalachian Coals.* Here the joint sales agreement applies only to a limited type of customer, no licensee is foreclosed from competing for the business independently, and there is absolutely no basis in the record for assuming that a powerful national purchaser like Ward's is foolishly suffering a higher price from the program than it could at any time obtain from other national suppliers that no doubt would be pleased to have the business. Sealy's success with Ward's, in fact, appears to reflect an increase in interbrand competition with no diminution of intrabrand competition, because Sealy licensees could not have competed effectively for the business without combining to offer a single source of supply. In *2361 State Corporation v. Sealy, Inc.,* 402 F.2d 370, 374 (7th Cir. 1968), this court had occasion to consider Sealy's national accounts program. We indicated at that time that the Rule of Reason ought to be applied to the program, but held that Sealy had not met the strict requirements to justify summary judgment under the rule. *See Poller v. Columbia Broadcasting System, Inc., supra,* 368 U.S. at 473, 82 S.Ct. 486. Ohio has had its day in court to attack the program—it has had, in fact, four months in court—but it has failed to demonstrate the anticompetitive vice inhering in it.

It will not do to lump the program indiscriminately in with the proven elements of Ohio's territorial allocation case, as Ohio invites us to do. Although most sales are assigned to licensees on the basis of APR's, this is not invariably the case, and, more importantly, no licensee is restrained *by the program* from competing in any territory for the business of national account customers. Nor does Ohio's assertion that it has proved a resale price maintenance agreement between Sealy and Ward's advance its argument. If such an agreement were found, the antitrust laws would surely provide a remedy, by way of trebled damages caused thereby (which Ohio did not claim to suffer) or an injunction, sought by one injured by the agreement (which Ohio did not claim to have been) or the United States. But the existence of the *agreement,* which we assume *arguendo,* really says nothing about the reasonableness of the *program,* which is a separate practice in a separate market.

Ohio also claimed damages of nearly $300,000 in royalties paid to Sealy on Ohio's sales of non-Sealy label goods. The license agreement called for royalties on such sales (in lower amount, naturally, than for Sealy products), and Ohio attacks this provision of the agreement. Because nearly all the sales in question were made to Ward's, the parties treat this claim as part of the national accounts element of Ohio's case, but the rationale of liability is quite distinct: Ohio says that to require the payment of royalties on products not sold under Sealy's trademark is a *per se* violation of the antitrust laws, citing *Zenith Radio Corp. v. Hazeltine Research, Inc., supra,* 395 U.S. at 135–36, 89 S.Ct. 1562. *Zenith,* however, does not stand for the propositions for which Ohio's claim requires its support. First, the Court did find patent misuse in that case, but it expressly stated that

> it does not necessarily follow that the misuse embodies the ingredients of a violation of either § 1 or § 2 of the Sherman Act . . . .

*Id.* at 140, 89 S.Ct. at 1585. Second, the misuse involved was the *conditioning* of a

patent license on the licensee's agreement to pay royalties on products both using and not using the teachings of the patent. The Court expressly reaffirmed the rule of *Automatic Radio Mfg. Co. v. Hazeltine Research, Inc.,* 339 U.S. 827, 70 S.Ct. 894, 94 L.Ed. 1312 (1950), that a patent owner could negotiate for royalties on total sales (whether or not all sales used the patent) as a convenient measure of the value of the license. It was simply the refusal to license on any other terms that constituted the misuse, and the Court pointed out that no inference of such conditioning could properly be made simply because a license provision called for royalties on total sales. 395 U.S. at 138, 89 S.Ct. 1562.

Even if the leverage allegedly used by Sealy to obtain non-Sealy product royalties were the bare grant of the right to use a patented product, Ohio's claim would fail for the lack of a showing of conditioning. Although the letter accompanying Sealy's post-*United States v. Sealy* decree proposed license agreement indicated that the failure to accept the agreement would lead to license termination, extensive negotiations were in fact had over agreement provisions, and Ohio was able to obtain revisions in the proposed agreement. There was no evidence that Ohio sought to eliminate the non-Sealy royalties, which no doubt would have resulted in a higher royalty on the Sealy-brand products. Moreover, Sealy obtained royalties not merely for the bare license of its trademark, but also for significant advertising, technical, and other services. To argue that none of the services provided in the package could have benefited the licensed plants other than in the production and sale of Sealy-brand products is to far outrun the facts in the record. It is significant, also, to recall that over 97% of the royalties Ohio paid were for sales to Ward's. Without the organizational and management services of Sealy, and the specifications developed between Ward's and Sealy, such sales would never have been made, as Ohio's experience since withdrawing from the national accounts program so amply demonstrates.

Our analysis in this section of the opinion leads to the conclusion that the jury was permitted to consider awarding $401,681 in damages for practices of Sealy that did not violate the antitrust laws. That error obviously does not entitle Sealy to a judgment n. o. v. on all of Ohio's case. Because we cannot know that the jury did not award the full amount claimed on these theories, that amount would have to be deducted from the amount of the verdict to insure the lack of prejudice to Sealy. The consequences of our conclusion here on the judgment appealed cannot be determined, however, just yet. In Section II of this opinion, we consider the attacks made on the district court's decision to condition the denial of Sealy's new trial motion on a 50% remittitur. If the district court was right, an additional remittitur offer of $401,681 (trebled) would cure the error we have found. If Sealy is right that prejudicial errors existed that remittitur could not cure, our remarks on national accounts and non-Sealy royalties will become only guidance for the future conduct of the litigation. And if there did not exist prejudicial errors sufficient to mandate new trial or justify the remittitur, then the accepted remittitur would render totally harmless the submission of these theories to the jury.

II. *Prejudicial Misconduct, Remittitur, and New Trial*

■ As we have stated, the district court denied Sealy's motion for a new trial conditionally on Ohio's accepting a 50% remittitur, which it did. The court rejected Sealy's claims that references to *Sealy Mattress Co. of Southern California v. Sealy, Inc.,* supra, 346 F.Supp. 353,[31] and *United States*

---

31. The district court judge decided that a danger existed that the jury might have realized that the cited case, see n.7 supra, was tried by him and resolved adversely to Sealy. The court concluded, however, that the error, if it existed, was harmless. We think it doubtful from our review of the record that the jury would have made the connection between the California licensee's case and the presiding judge here, or that it would have inferred that the court had found Sealy at that time to be violating the antitrust laws (the case involved

*v. Sealy, supra,*[32] created improper prejudice, but ruled that trial misconduct by Ohio's counsel had led the jury to award excessive damages for which the remittitur was suggested as a cure. Sealy argues here that the court's findings of trial misconduct amounting to prejudice required the court to grant a new trial, because the prejudice could not be said to have been confined to the damage award. Ohio denies that there was prejudicial misconduct, but insists that the district court acted properly to cure it if there was.

We must confess to having some difficulty understanding how prejudicial misconduct could be said with certainty to have affected the jury's decision only as to damages. *See Minneapolis, St. Paul & Sault Ste. Marie Ry. Co. v. Moquin,* 283 U.S. 520, 521–22, 51 S.Ct. 501, 75 L.Ed. 1243 (1931). We do not decide the question here, however, because we have reached the conclusion that the district court committed clear error in ruling that prejudicial misconduct existed. As we have indicated, Ohio denied the existence of prejudicial misconduct in its brief, although its primary contention on this issue was that the district court's resolution of any problem that may have existed was adequate. At oral argument, Ohio renewed its denial of prejudice, asking that this court, if it should be inclined to accept Sealy's challenge to the cure of remittitur, satisfy itself that the district court was correct in finding prejudice. Any hesitancy

we might have had in addressing an issue not fully discussed in the briefs on appeal is more than alleviated by the voluminous post-trial briefs filed in the district court, which we have considered along with the record in the case.

We think it clear that Ohio is entitled to make this argument, despite Sealy's protestations. It is quite true that a plaintiff who accepts a remittitur may not appeal from the district court order proposing it as an alternative to a new trial. *Donovan v. Penn Shipping Co., Inc.,* 429 U.S. 648, 650, 97 S.Ct. 835, 51 L.Ed.2d 112 (1977). The *Donovan* principle also forecloses Ohio from seeking reinstatement of the 50% remitted now that Sealy attacks the remittitur on appeal. As this court held in the recent case of *Durant v. Surety Homes Corporation,* No. 77–2045, 582 F.2d 1081, 1085 (7th Cir. August 8, 1978), however:

> On the other hand, a prevailing party may quite properly defend his judgment on any ground supported by the record. *Dandridge v. Williams,* 397 U.S. 471, 475 n.6, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970). For the limited purpose of defending the remitted judgment they have accepted, we believe the Durants are entitled to argue that the district court erred in conditioning the denial of Surety's new trial motion on the acceptance of a remittitur.

Sealy's post-trial motion listed no less than 86 instances of alleged prejudicial mis-

---

only the licensee's claim that its license contract was not nullified by the *United States v. Sealy* decree) even if it had realized the identity of the judge deciding the case. We do agree, however, that any error involved was harmless. Sealy does not attack this conclusion.

**32.** Sealy argues that *United States v. Sealy* should have been kept out of the trial and that at least an exhibit pertinent thereto that was sent to the jury room mandated a new trial. We agree with Sealy and the district court that *Sealy* could not form the basis of a collateral estoppel on liability herein, but think it clear from the facts of this case that *Sealy* was very much a relevant and proper part of the background of this litigation. The exhibit in issue here contained Judge Austin's findings and conclusions in *Sealy* both before and after the Supreme Court opinion, and a short precis (approved by the district court herein) of the latter

opinion. We agree with the district court and the parties that it would have been better if the jury had not been given Judge Austin's opinions. (These were apparently left in the exhibit transmitted to the jury accidentally.) We are unable, however, to find any real possibility of prejudice resulting from the transmittal. The exhibit was one of *many* exhibits sent to the jury. The fact that Sealy had engaged in market allocation was properly known to the jury without the exhibit, and the jury was correctly instructed that if it found Sealy to have continued the practice, it should find a *per se* violation. As to Judge Austin's findings that Sealy had also engaged in illegal resale price maintenance, we agree that those facts were of little if any relevance to this case, but Sealy's own witness, on direct examination, had testified to the prior practice and its illegality.

conduct by Ohio's trial counsel. We have no intention of further extending the length of this opinion by repeating the list and setting the context of each incident. A general summary will suffice. At various times, counsel stated that Sealy was attempting to get favorable testimony before the jury while precluding Ohio from developing the whole story pertinent thereto, referring, e. g., to the California licensee's lawsuit referred to above, notes 7 & 31, which was true even though scarcely graciously put. Counsel frequently disparaged Sealy's witness by insinuations in questions, or by stating in response to objections, that the witnesses were unresponsive, that they "remembered" details much better when Sealy's counsel sought testimony from them than when the witnesses were pressed on cross- or adverse examination, that various business reasons for Sealy practices put forward by its witnesses were not true reasons, that a witness lacked knowledge of the subject matter of his testimony, and that witnesses were testifying inconsistently. One of the most extreme instances of this type of conduct occurred in response to an objection to counsel's taking so long to cross-examine a Sealy witness, when counsel replied, "It is a lot harder to crack a phony story, than to tell it in the first place, Judge." Counsel also made numerous statements along the lines that Sealy's counsel was engaged in improperly "testifying" in his role as counsel, was improperly arguing to the jury during the taking of testimony, and had made repeated factual errors. Other comments were made between counsel (and definitely not just by Ohio's counsel) that can only be characterized as either harmless badinage or occasionally angry exclamations of no particular consequence, a number of which appear on Sealy's list. Counsel also engaged in several argumentative ejaculations that clearly ought not to have been made, two of the most serious of which were "Let's ask the price fixer the question" and "If the Sealy organization is in favor of it, it is most probably illegal."

We have carefully examined the pertinent portions of the record, and can sum up part of our reactions by saying that some of the items on Sealy's laundry list were quite arguably unobjectionable, others were objectionable, if at all, only on the basis of their tone, and others were no doubt improper behavior. The decision as to whether those items which were improper produced prejudice denying Sealy a fair trial, however, cannot be made without examining the general context of the trial to determine the possible impact. *See* 6A Moore's Federal Practice ¶ 59.05[3] at 59–54 (1974).

This was a long jury trial of a complex antitrust case. While the challenges and subtleties of antitrust law often hold a strong fascination for lawyers, a trial such as this one could hardly be expected to keep the average lay juror on the edge of his or her seat for twelve weeks. Recognizing this, in fact, the district court and the attorneys for the parties engaged in a running facetious colloquy throughout the trial, the point of which was that jurors might tend to doze off as a trial day wore on, and that by three o'clock some sparks set flying by counsel could be just the thing to regain the jury's full attention. The court often would advise counsel after a verbal skirmish over some objection or other that "we needed that." The court repeatedly expressed its view, informed by observation of the jury, that the jurors seemed to like both lead counsel and their different styles, that the attorneys had done a fine job of livening up a potentially deadening case, that the jury would be able to sort out the evidence from the personalities when they deliberated, and that the court could perceive no real possibilities of prejudice to either party. This is not to say that the court refused to intervene when it perceived counsel approaching the line of possible prejudice. Numerous objections were properly sustained, and the jury was repeatedly admonished that the exchanges of the lawyers were not evidence and were not to be considered in deciding the case. *Compare New York Central Railroad Company v. Johnson,* 279 U.S. 310, 318, 49 S.Ct. 300, 73 L.Ed. 706 (1929); *with Koufakis v. Carvel,* 425 F.2d 892, 901, 903 (2d Cir. 1970), on

which Sealy heavily relied in its post-trial briefs in the district court. We surely would not bind Sealy thereby, but it is interesting to note that at a point in the trial when nearly half of the cited seriously prejudicial incidents had occurred, Sealy's lead counsel told the court:

I will say this, your Honor, and it may prejudice me if I should ever find myself in a position where I have to appeal here, but I will say it nevertheless. I think you have done a great job of giving the parties just as fair a trial as a judge could ever do.

It also is worth pointing out that although it would not be fair to characterize all (or nearly all) of Ohio's counsel's alleged misconduct as responsive to arguable improprieties by Sealy's counsel, numerous instances can be so described, *see Stanczak v. Pennsylvania R. Co.,* 174 F.2d 43, 48 (7th Cir. 1949), and it can certainly be said that Sealy's counsel strayed from the straight and narrow on more than a few occasions. Counsel for both sides definitely contributed to keeping the jury awake.

At one point relatively late in the trial, the court commended the attorneys as follows:

The Court: Gentlemen, I am real proud of you. You are doing so much better than I expected. I approached this case with great fear and concern.

Mr. Hastings: You thought there were going to be fisticuffs?

The Court: Yes, yes.

In the month of trial that followed, involving nearly 2400 pages of transcript, only seven additional incidents occurred which Sealy even bothered to include in its list of 86 prejudicial occurrences. All were minor in nature.

While we do not condone conduct by counsel not designed to advance his case by properly established procedures, we are also not unmindful that in the heat of advocacy, conduct and words which are exchanged and which when viewed on the cold record appear to be on the unseemly side may very well not be so regarded that way at all by the jury, particularly when they occur in the give and take of a hotly contested and extended lawsuit. "Juries are not so likely to get excited or inflamed by lawyers' talk as lawyers think they are." *Smith v. Philadelphia Transp. Co.,* 173 F.2d 721, 726 (3d Cir. 1949). If the jury were to be prejudiced by such activity it would be just as likely that it would be directed toward the offender. Ultimately we think the common sense of a jury will prevail in most instances and we are not concerned on the present record that that is not the situation.

When the jury returned its $6.8 million verdict, the district court queried the attorneys whether he had discretion not to treble the damage award. The court was advised that Congress had left no discretion on that point, and, as the court later stated in arguments on post-trial motions, it was very surprised at that result. During those arguments, Sealy's counsel told the court that a judgment in excess of $20 million would wipe out Sealy's net worth and require giving the whole business to Ohio. These factors clearly influenced the court. As it stated in its ruling on the new trial motion:

The size of the jury's verdict was shocking. At the time it was returned I considered it shocking and asked "How did it happen[?]"

After reflection on Sealy's 86 instances of alleged misconduct, the court decided that those instances must have produced prejudice in the jury room, notwithstanding that, as we have noted, the court had consistently throughout the trial, in the context in which the instances occurred and with the benefit of observation of the jury, expressed its view that no prejudice had been created.

We have concluded that the district court erred in the decisional result of the search on which it embarked for causative error. In the first place, we cannot read the court's decision as an exercise of its discretion to weigh the evidence and to find a damage award not fairly supported thereby, for beyond passing comments that some of the damages claimed tended to the speculative, the court engaged in no weighing of the evidence. Indeed, the court's shock at

the size of the full judgment appears to have derived as much from its recognition that trebling was mandatory as from any concern that the facts did not support the award. There was in fact competent evidence that could have supported a verdict substantially higher than that returned. That the jury returned an award lower in amount that the evidence, if believed, could warrant may itself be an indication of a lack of jury passion and prejudice. *See Stanczak, supra* at 48; *Cf. Koufakis, supra* at 901; *Missouri-K,-T. R. Co. of Texas v. Ridgway,* 191 F.2d 363, 368–69 (8th Cir. 1951). Moreover, it was plainly the jury's task to decide whether or to what degree to believe Ohio's damages evidence. It was properly instructed on proximate cause, and that it should only award damages capable of reasonable ascertainment and must not speculate or guess. We note in this regard that Sealy's attacks on Ohio's damages evidence during the trial may fairly be described as mild, and it did not even go into the issue on final argument. Recognizing that "damage issues in these cases are rarely susceptible of the kind of concrete, detailed proof of injury which is available in other contexts," *Zenith Radio Corp. v. Hazeltine Research, Inc., supra,* 395 U.S. at 123, 89 S.Ct. at 1576, we think the Court's conclusion in *Eastman Kodak Company of New York v. Southern Photo Materials Company,* 273 U.S. 359, 379, 47 S.Ct. 400, 405, 71 L.Ed. 684 (1927), applies equally here:

> [P]laintiff's evidence as to the amount of damages, . . . was competent; . . . it sufficiently showed the extent of the damages, as a matter of just and reasonable inference, to warrant the submission of this question to the jury. The jury was instructed . . . that the amount of the damages could not be determined by mere speculation or guess, but must be based on evidence furnishing data from which the amount of the probable loss could be ascertained as a matter of reasonable inference. And *the question as to the amount of the plaintiff's damages having been properly submitted to the jury, its determination as to this matter is conclusive.* [Emphasis added.]

*Accord, Bigelow v. RKO Radio Pictures, Inc.,* 327 U.S. 251, 264, 66 S.Ct. 574, 90 L.Ed. 652 (1946); *Fontana Aviation, Inc. v. Beech Aircraft Corporation, supra,* 432 F.2d at 1085–86. Accordingly, we are of the opinion that the district court was mistaken in taking the size of the jury's award as a demonstration that there must have been prejudice created somewhere.

Also, as we have suggested, we have reached the firm conviction that the court erred in finding that there was in fact such prejudice. It should go without saying that we are reluctant to overturn the finding of the district court on such a matter, as we do not have the benefit of having observed the trial and felt its pulse. On the other hand, the considerable deference usually to be accorded to a district court's evaluation of the effect of misconduct is necessarily reduced in this case, where the court, while observing the trial and perceiving its tone, consistently stated in definite terms its confidence that no prejudice was extant, and only a year later, in ruling on post-trial motions, did the court reverse its view. It is axiomatic that litigation parties are entitled only to a fair trial, not to a perfect one. Our thorough and independent review of the record has convinced us that the district court was right the first time, that it did a commendable job of ensuring that the parties received a fair trial, and that it committed error in applying hindsight to a trial that was by no means perfect but that was free from prejudicial error.

Accordingly, in view of the fact that the jury verdict was unnecessarily halved, Sealy was, to say the least, not prejudiced by the district court's disposition of its new trial motion.[33] The remitted damage judgment in Ohio's favor is affirmed.

### III. *The District Court's Denial of Equitable Relief*

■ After disposing of the post-trial motions, the district court took additional

---

**33.** It follows from our conclusion here that submitting the national accounts program and non-Sealy royalty damages to the jury was only harmless error.

evidence in hearings on equitable relief and ultimately decided, notwithstanding the jury's determination that Sealy had violated the antitrust laws, that Ohio was entitled to no equitable relief whatsoever. The legal principles applicable to Ohio's appeal from that denial are straightforward and undisputed. Relief under Section 16 of the Clayton Act, 15 U.S.C. § 26, "invokes traditional principles of equity . . .." *Zenith Radio Corp. v. Hazeltine Research, Inc., supra,* 395 U.S. at 130, 89 S.Ct. 1562. Accordingly, a district court might properly find violations of the Sherman Act and yet upon application of the traditional equity principles determine that injunctive relief was not appropriate. On the other hand, injunctive relief under Section 16 is

characteristically available even though the plaintiff has not yet suffered actual injury, . . . he need only demonstrate a significant threat of injury from an impending violation of the antitrust laws or from a contemporary violation likely to continue or recur.

*Id.*

Where both legal and equitable relief are sought by a plaintiff, the Seventh Amendment right to a jury trial requires that the legal claims be tried first, to a jury. *Beacon Theatres, Inc. v. Westover,* 359 U.S. 500, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959). This court's decision in *Florists' Nationwide Telephone Delivery Network v. Florists' Telegraph Delivery Association,* 371 F.2d 263, 270–71 (7th Cir.), *cert. denied,* 387 U.S. 909, 87 S.Ct. 1686, 18 L.Ed.2d 627 (1967), provides a useful summary of the implications of a jury's antitrust verdict for a district court's subsequent ruling on equitable relief. Any actual issues necessarily and actually decided by the jury are foreclosed under settled principles of collateral estoppel from subsequent reconsideration by the district court. The court may not make findings "contrary to or inconsistent with the jury's resolution . . . of that same issue as implicitly reflected in its general verdict . . . on the damages claim." *Id.* at 271.

In this case, the jury returned a general verdict, and we agree with Sealy that given the complexity of the issues before the jury, the verdict by itself and out of the context of the trial could not necessarily be said to have foreclosed any particular issue. *See Russell v. Place,* 94 U.S. 606, 608–09, 24 L.Ed. 214 (1877); 1B Moore's Federal Practice ¶ 0.443[4] (1974). The amount of the verdict, however, makes it a mathematical certainty that the jury found at least one of Sealy's first-refusal acquisitions, discussed *supra,* to have violated the antitrust laws. The jury was instructed that it could not find the use of a right of first refusal to constitute a violation unless it also found that the right was used as part of an unlawful scheme. The only unlawful scheme of which the acquisitions could have been part was, as Ohio maintained at trial, market allocation. The court's instructions, indeed, discussed the acquisitions as part of the instructions on allocation. We think the court erred, thus, in premising its equitable relief decision on the assumption that the only fact established by the jury verdict was that at least one acquisition somehow violated the antitrust laws. Under the evidence and the instructions, and as the case was argued, the jury verdict must also be read to include a finding that Sealy was engaged in a scheme of market allocation in which one or more acquisitions were at least a part.

The district court should have approached the requested equitable relief in the light of this established fact, but it did not do so. We think the court should have another opportunity to consider equitable relief on market allocation in this light, and with the benefit of the law applicable to this case as we have discussed it in part I of this opinion. We do not mean to say by any means that the court must find any particular practice attacked by Ohio to violate the antitrust laws. It should consider the evidence adduced both at the jury trial and at the equitable relief hearing, and will be free to make findings not inconsistent with the jury verdict. If the court should find, however, that practices we have said might properly be found to be components of an

illegal market allocation scheme were not such, it should explain its analysis in greater detail than it no doubt thought necessary to do in rendering decision on the assumption that the existence of market allocation was open to question. The court should also bear in mind that once a violation is established, as at least one is here, the court may properly enjoin the defendant from "other related unlawful acts." *Zenith, supra*, 395 U.S. at 133, 89 S.Ct. 1562. This practice serves the public interest by "effectively pry[ing] open to competition a market that has been closed by defendant's illegal restraints." *Id.*[34]

With reference to Ohio's mattress components claims, we agree with the district court that the jury's verdict does not necessarily establish a violation here. We do believe the court should reconsider its decision as to past components violations in the light of part I–B of this opinion, and should explain its reasons for finding no past violations, if it should continue to adhere to that view. Sealy argues on appeal that evidence introduced at the equity hearing established that Sealy has modified its practices so as to eliminate all possibility of injury to licensees like Ohio. The district court on remand will, of course, be free to find that this is true, but it has not yet done so and it is not for us to make findings based, ultimately, on the credibility of witnesses we have never seen.

On remand the district court may, of course, take any additional evidence or argument it might find helpful. Circuit Rule 18 will not apply, however. We have full confidence that the district court judge will approach the equitable relief problems afresh, with the benefit of the views expressed herein, and that the interests of efficient judicial administration will unquestionably be well served by leaving the case with the judge who has already become expert in its many intricacies.

## IV. *Post-Judgment Interest*

█ On April 3, 1975, judgment on the jury's general verdict was filed with the Clerk of the District Court and entered in the civil docket. The prompt entry of the judgment rendered it effective under Rule 58, Fed.R.Civ.P., and comported with that rule's mandatory language that "upon a general verdict of a jury, . . . the clerk, unless the court otherwise orders, shall forthwith prepare, sign, and enter the judgment without awaiting any direction by the court . . . ." In fact, entry of the judgment followed a brief proceeding before the district court in which Sealy's counsel agreed with counsel for Ohio that prompt entry was "automatic."

Under 28 U.S.C. § 1961,

[i]nterest shall be allowed on any money judgment in a civil case recovered in a district court. . . . Such interest shall be calculated from the date of the entry of the judgment, at the rate allowed by State law.

To avoid the interest accruing on the $10,-222,278 to which Ohio had agreed to remit its judgment, Sealy thereafter argued to the district court successfully, that Ohio should be awarded interest only from the date of the final judgment in which the court denied equitable relief and wrapped up the case, January 18, 1977. The court ordered, accordingly, that Ohio was to be deprived of interest on its entered damages judgment during the more than twenty months preceding the court's resolution of remaining issues in the case. We disagree.

To begin with, the language of Rule 58 read with § 1961 seems perfectly clear. Judgment is to be entered promptly, and interest runs from the date of entry. To persuade us that this language does not mean what is says, Sealy advances two arguments, neither of which, in our opinion has merit.

---

**34.** We express no view on the propriety of Ohio's request that the court order Sealy to divest the acquired licensees to Ohio, other than to say that the court should consider this issue along with all others in deciding what total mix of equitable relief, if any, might be just in the circumstances, and to state that such relief would not be foreclosed simply by Ohio's having received damages for past lost profits on this theory. Obviously, in any event Ohio would not be allowed to receive the licensees without payment therefor.

First, it says that prior to January 18, 1977, absent an order of court pursuant to Rule 54(b), Fed.R.Civ.P., there could be no final judgment on which interest could run. The initial difficulty with this argument is that § 1961 does not in terms require that a judgment be final in the sense of tying up all the issues in a case. Congress knew how to specify finality when it was intended, *see* 28 U.S.C. § 2411, and it did not do so here. Moreover, the cases cited by Sealy do not support its position. In *Caputo v. U. S. Lines Company*, 311 F.2d 413 (2d Cir.), *cert. denied sub nom. Imparato Stevedoring Corp. v. United States Lines Co.*, 374 U.S. 833, 83 S.Ct. 1871, 10 L.Ed.2d 1055 (1963); and *Howell v. Sinclair Refining Company*, 20 F.R.D. 623 (N.D.Ala.1957), the courts did indeed deny interest on judgments entered by the respective clerks, on the basis that the judgment entries had been made prematurely. But both cases fell squarely within Rule 54(b), which governs judgment: "[w]hen more than one claim for relief is presented in an action, whether as a claim, counterclaim, cross-claim, or third-party claim . . . ." In such cases, the court may expressly direct the entry of judgment as to less than all of the claims upon an express finding that there is no just cause for delay. Until and unless the court does so, as the courts in *Caputo* and *Howell* emphasized, the clerk has no authority to enter judgment, for Rule 58 is expressly made subject to the provisions of Rule 54(b). Both courts recognized that if the 54(b) direction had been made, thus rendering the entry of judgments proper, interest would have run from the date of entry. Here, in contrast, we do not have the separate claims that call Rule 54(b) into play, but merely one claim for two types of relief. Nothing in the district court's decision on equitable relief could have had any bearing on Ohio's valid judgment for damages, and it would make no sense to adopt the rule that the interest to which Ohio is enti-

tled by law on its judgment properly entered under Rule 58 had to be forfeited if Ohio desired to press its request for equitable relief.

Sealy's second argument is that when motions for a new trial and for judgment notwithstanding a jury verdict are filed in a case, judgment on the verdict may not properly be entered until those motions are disposed of.[35] Sealy cites *Murphy v. Lehigh Valley R. Co.*, 158 F.2d 481, 485 (2d Cir. 1946); and *Christian v. Southern Railway Company*, 151 F.Supp. 192 (E.D.S.C.1957) (following *Murphy*), which do support the proposition advanced, but with which we are constrained respectfully to disagree. We note initially that there is a definite authority the other way. *Louisiana & Arkansas Ry. Co. v. Pratt*, 142 F.2d 847, 848–49 (5th Cir. 1944); *Litwinowicz v. Weyerhaeuser Steamship Company*, 185 F.Supp. 692 (E.D.Pa.1960); 6A Moore's Federal Practice ¶ 58.04[2] at 58–124–26 (1974). The latter authorities seem to us clearly more in keeping with the meaning of the Federal Rules of Civil Procedure. Rule 58, as we have said, calls on district court clerks to enter judgment on general jury verdicts promptly without even waiting for directions from the presiding judge, let alone waiting to see whether the losing defendant will file post-trial motions. In fact, Rules 50(b) and 59(b), (e) define the timely filing of such motions as being not later than ten days after "entry of the judgment," the very act Sealy would have us hold cannot properly occur if post-trial motions are filed. Plainly Rule 59 and Rule 50 contemplate that judgment will be entered promptly without regard to whether post-trial motions are in the offing. So does Rule 62(b), which gives the district courts discretion to stay the execution of judgments pending disposition of post-trial motions.

Because of Rule 62, there can be no prejudice to a defendant if interest runs, as 28

---

**35.** This argument would theoretically deny Ohio interest only until May 27, 1976, when Ohio filed its remittitur, except that no renewed judgment was entered at that time or, indeed, until January 18, 1977. Because we reject the assertion that judgment was improperly entered on April 3, 1975, we need not decide whether, if the assertion were accurate, Ohio could legitimately seek interest for the period between May 27, 1976 and January 18, 1977.

U.S.C. § 1961 provides, from the entry of judgment. If post-trial motions are successful, or if defendant gains judgment or a new trial on appeal, it will be forced to pay no interest. Where, as here, the motions are unsuccessful or successful only to the extent of reducing the amount of the judgment, the defendant will pay only that interest to which the plaintiff is lawfully entitled. Ohio should receive the lawful rate of interest on its remitted judgment from the date of entry, April 3, 1975.

For the reasons stated herein, the final judgment herein is affirmed insofar as it awards Ohio $10,222,278 in damages, and reversed insofar as it denies all equitable relief and the right to interest from April 3, 1975 on the remitted damage judgment, and the case is remanded for further proceedings consistent herewith.