OHIO–SEALY MATTRESS MANUFAC-
TURING CO. et al., Plaintiffs,

v.

Louis C. DUNCAN et al., Defendants.

No. 79 C 2741.

United States District Court,
N. D. Illinois, E. D.

Jan. 30, 1980.

Frederic F. Brace, Jr., William F. Conlon, Sidley & Austin, James K. Gardner/Thomas P. Holden, Ralph T. Russell/Phil C. Neal, Chicago, Ill., for plaintiffs.

John H. Matheson, Hedlund, Hunter & Lynch, Hunter, Howard R. Koven/Friedman & Koven, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

ASPEN, District Judge.

This action represents yet another chapter in the seemingly endless antitrust litigation concerning Sealy, Inc. ("Sealy").[1] The principals herein are Sealy,[2] Ohio-Sealy Mattress Manufacturing Company ("Ohio"),[3] and Sealy Mattress Company of Oregon ("Portland").[4] Ohio filed this action against Sealy in July, 1979, alleging that Sealy, its directors, and licensees were engaged in a continuing conspiracy to effect a horizontal territorial allocation of the market for Sealy products. The complaint further alleges a breach of the fiduciary duty by the named directors of Sealy.

---

1. *See, e. g. United States v. Sealy, Inc.*, 388 U.S. 350, 87 S.Ct. 1847, 18 L.Ed.2d 1238 (1967) ("Sealy"); *Ohio-Sealy Mattress Mfg. Co. v. Sealy, Inc.*, 585 F.2d 821 (7th Cir. 1978), *cert. denied*, 440 U.S. 930, 99 S.Ct. 1267, 59 L.Ed.2d 486 (1979), *on remand to the district court for consideration of equitable relief,* Civil Action No. 71 C 1243 (N.D.Ill.) ("Ohio-Sealy"); *Ohio-Sealy v. Kaplan*, Civil Action No. 76 C 810 (N.D.Ill.).

2. The defendant Sealy is a Delaware corporation with its principal place of business in Chicago, Illinois. It is the owner of certain trademarks under which Sealy bedding is sold, and licenses the use of those trademarks by various companies. The licensees of Sealy—twelve in number—own more than 90 percent of the Sealy shares. As a licensor, Sealy provides national advertising for Sealy products as well as other services functions, such as product specifications, quality control, research and development, and marketing plans. In return, Sealy receives royalties from the licensees based on the licensees' total sales. In addition, Sealy itself in recent years has become involved in the sale and manufacture of Sealy bedding through a number of wholly-owned subsidiaries.

3. Ohio-Sealy, the plaintiff herein, is an Ohio corporation with its principal place of business in Ohio. Ohio is one of the largest Sealy licensees, as it has five wholly-owned subsidiaries and primary responsibility for the territories composed of six states, the Commonwealth of Puerto Rico, and the American Virgin Islands. Ohio is also one of the best Sealy subsidiaries, in that it produces a consistently high-quality product, markets it effectively, and turns a better profit on its operations than either the defendant or the other licensees.

4. Portland, also a licensee of Sealy, is an Oregon corporation with its principal place of business in Portland, Oregon. Its primary sales area consists of Alaska, Idaho, Oregon, and Washington.

On November 19, 1979, Ohio sought leave to file a Supplemental Complaint consisting of two additional counts against Sealy arising from its decision to purchase Portland.[5] In August, 1979, Ohio entered into a stock purchase agreement with Portland. Pursuant to the agreement, the stockholders of Portland agreed to sell to Ohio all their shares for $7,250,000 and 112,500 shares of Ohio common stock. Sealy also agreed to indemnify each Portland stockholder up to the aggregate sum of $6,250,000 against any adverse judgment entered against them in the Sealy litigation.

In accordance with the Sealy License Agreement, Portland and Ohio notified Sealy of the intended acquisition. Sealy's board of directors met in September, 1979, to consider whether Sealy should exercise its right of first refusal. In early October, Sealy authorized the purchase of 112,500 shares of Ohio common stock in order to enable Sealy to match Ohio's offer if it so chose. By November 13, 1979, Sealy had succeeded in purchasing 112,500 shares of Ohio common stock on the open market. On that same day, the board of directors met and voted to purchase Portland by exercising the right of first refusal. Portland was notified of this action the following day, and chose to go forth with the sale to Sealy rather than exercise its right to withdraw the offer to sell. The closing date for the purchase was scheduled for January 3, 1980.

In its supplemental complaint of November 19, Ohio alleges that Sealy's exercise of the right of first refusal with respect to Portland failed to comply with the contractual requirements for an exercise of that right, constituted tortious interference with Ohio's contractual relationship with Portland, and violated federal antitrust law.[6] At the same time, Ohio filed a motion for a preliminary injunction, seeking to prevent Sealy from closing its purchase of Portland. On December 6, the Court assigned this, as well as an earlier related case involving Sealy,[7] to a magistrate for supervision of all pretrial matters, and for the submission of proposed findings of fact and conclusions of law with respect to the motion for a preliminary injunction. 28 U.S.C. § 636(b)(1)(A), (B).

The magistrate held an evidentiary hearing on the motion for preliminary injunctive relief for six trial days, from December 13–21, 1979.[8] During this period, Portland moved to intervene in the motion, alleging that its stockholders would be irreparably harmed if the sale were not permitted to close on January 3, 1980. Leave to intervene was granted, and Portland thereafter filed a document objecting to the attempt to enjoin the sale.[9] At the close of the evidentiary hearing, Ohio and Sealy stipulated to an extension of the closing date until January 31, 1980, an extension which is provided for in the purchase agreement.[10]

---

**5.** By a separate order, the Court has granted Ohio's motion for leave to file a Supplemental Complaint.

**6.** Jurisdiction of the antitrust claims is conferred upon this Court by Section 4 of the Sherman Act, 15 U.S.C. § 4, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26. Jurisdiction of the state law claims is premised on the diversity statute, 28 U.S.C. § 1332.

**7.** *Ohio-Sealy v. Kaplan*, Civil Action No. 76 C 810 (N.D.Ill.).

**8.** During these proceedings, Ohio called five witnesses to testify and introduced into evidence 73 exhibits. Sealy offered testimony of six witnesses and placed 10 exhibits into evidence.

**9.** Leave was granted upon the oral motion of counsel who represented Portland. The document filed, however, was by a different attorney on behalf of the stockholders of Portland. Counsel then reappeared on behalf of Portland, the corporate entity, and requested to withdraw Portland's intervention. The magistrate declined to dismiss the corporate entity pending clear identification of all the Portland stockholders, so as to insure that all parties necessary to effect any possible relief were present. The Court agrees with the magistrate's action. Since no further identification of the Portland stockholders has been offered, both Portland and its stockholders remain as intervening parties on this motion for preliminary injunction.

**10.** Portland objected to this extension by a motion filed December 28, 1979. Since this extension was made pursuant to a contractual provision in the purchase agreement, however, the Court finds no basis for Portland's objection.

On January 16, 1980, the magistrate issued his proposed findings of fact and conclusions of law. He concluded that there was a likelihood that Ohio would prevail on the merits of its antitrust claims, but not on its contract and tort theories. The magistrate also determined, however, that Ohio would suffer no irreparable harm if Sealy were allowed to close the sale and Ohio later prevailed on the merits. As to the balance of hardships, he found that the harm that would flow to Ohio from failing to enjoin the purchase was no greater than was the harm that would accrue to Sealy if an injunction were issued.[11] Finally, the magistrate concluded that issuance of an injunction would not be contrary to the public interest.

On the basis of these conclusions, the magistrate recognized that injunctive relief normally would fail to issue, since there was no proof of irreparable harm to the moving party. He observed, however, that the legality of Sealy's various licensing provisions—including the right of first refusal—currently is being litigated before another judge in this district.[12] Since the magistrate believed that the outcome therein might be determinative as to whether Ohio or Sealy is entitled to purchase Portland, he recommended that both Ohio and Sealy be enjoined from purchasing Portland pending the ruling in Sealy. Yet, due to the harm that might result to Portland from prolonged uncertainty as to the identity of the ultimate purchaser, the magistrate recommended that if a ruling on the equitable

issues in *Ohio-Sealy* is not issued by April 30, 1980, then Sealy should be permitted to close its purchase with Portland at that time. Alternatively, the magistrate recommended that Sealy be permitted to close its purchase with Portland as scheduled on January 31, 1980, but that the closing should be subject to a "hold-separate" order which provides for the remedy of divestiture if Ohio prevails on the merits.

Pursuant to 28 U.S.C. § 636(b)(1), the parties were given ten days to file written comments on and objections to the magistrate's recommended findings and conclusions. All parties have done so.[13] Upon consideration of the evidence presented before the magistrate, his findings and recommendations, and the objections posed by the parties, the Court finds that Ohio is not entitled to an injunction prohibiting Sealy from closing its purchase of Portland. Rather, the Court adopts the magistrate's alternative recommendation, that the sale of Portland to Sealy be permitted to go forth on January 31, 1980, subject to a hold-separate order.

### I. The Standards For Preliminary Injunctive Relief

A preliminary injunction is a vehicle by which the conduct of a party may be prohibited prior to any conclusive determination on the merits that the conduct in question is in fact illegal or inappropriate. For this reason, the case law has recognized that a preliminary injunction is an extraordinary remedy "not to be indulged in except in a case clearly warranting it." *Fox Val-*

---

11. The magistrate did find, however, that an extended delay of the closing date for purchase—the unavoidable effect of the injunctive relief requested herein—would cause irreparable harm to Portland, "at least in the sense that Portland may have no legal recourse." Although the magistrate found that Portland could operate during a delay in the closing without a significant loss of business, he concluded that uncertainty as to Portland's ultimate purchaser would have a deleterious impact on the morale of Portland's employees and the company's operations.

12. After the jury verdict in *Ohio-Sealy*, the trial judge found that Ohio was entitled to no equitable relief whatsoever. The Seventh Circuit reversed this ruling, and remanded the case to

the district court for reconsideration of the appropriate equitable relief. *Ohio-Sealy v. Sealy*, Civil Case No. 71 C 1243 (N.D.Ill.), *on remand from* 585 F.2d 821 (7th Cir. 1978).

13. In addition to the parties that appeared before the magistrate, the Court granted leave to the Sealy Mattress Company of Michigan ("Michigan") to file an amicus brief. Michigan, a Sealy licensee, is a party defendant in *Ohio-Sealy v. Kaplan*, Civil Action No. 76 C 810 (N.D.Ill.). In that action, Michigan also has filed a cross-claim against Sealy, alleging that Sealy's exercise of the right of first refusal against Michigan in April, 1978, violated the antitrust laws.

ley Harvestore, Inc. v. A. O. Smith Harvestore Products, Inc., 545 F.2d 1096, 1097 (7th Cir. 1976). It is within the discretion of the Court to grant a motion for preliminary injunctive relief when the moving party satisfies its burden of persuasion as to each of the following prerequisites: (1) an inadequate remedy at law and irreparable harm in the absence of an injunction; (2) the threat of harm to the movant outweighs the harm that would result to the opposing party if an injunction issues; (3) at least a reasonable likelihood that the moving party will prevail on the merits; and (4) the public interest will not be disserved by the granting of injunctive relief. *Fox Valley*, 545 F.2d at 1097; *see also Citizens Energy Coalition of Indiana v. Sendak*, 594 F.2d 1158, 1162–1163.(7th Cir. 1979); *Local Division 519, Amalgamated Transit Union, AFL–CIO v. LaCross Municipal Transit Authority*, 585 F.2d 1340, 1351 (7th Cir. 1978).

### A. Irreparable Harm and Inadequacy of Legal Remedies

 It is beyond dispute that "[t]he basis for injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies." *Sampson v. Murray*, 415 U.S. 61, 88, 94 S.Ct. 937, 952, 39 L.Ed.2d 166 (1974); *Beacon Theatres v. Westover*, 359 U.S. 500, 506–507, 79 S.Ct. 948, 954–955, 3 L.Ed.2d 988 (1959); *Fox Valley*, 545 F.2d at 1098. At the outset, however, Ohio argues that this high standard need not be met in a case where the party seeking the injunction establishes

a clear probability of success on the merits; that in such cases, it is sufficient to show merely a "possibility" of irreparable injury. Although there are some cases which suggest this less stringent standard of irreparable harm,[14] this has never been the rule in the Seventh Circuit.[15] It must be remembered that the conduct enjoined by a preliminary injunction is presumptively legal.[16] Indeed, this is why the preliminary injunction is considered an extraordinary remedy. Yet, adoption of plaintiff's "possibility" standard for determining irreparable harm would dilute seriously the extraordinary nature of injunctive relief by making it more readily available.[17] Moreover, it would do so without advancing the underlying purposes of preliminary injunctions. A movant needs the protection of a preliminary injunction only when threatened with injury that could not be remedied even if in the future he prevailed on the merits. If a movant cannot persuade the court that there is more than a mere "possibility" of such harm, then he should not be entitled to the benefits of preliminary injunctive relief.

Ohio argues that it will suffer irreparable harm in three ways if an injunction does not issue. First, it argues that if it prevails at trial, it will be unable to prove fully the amount of profits it lost as a result of the unlawful acquisition of Portland. Not only will it be impossible to determine the extent to which Ohio could have increased the sales within Portland's area of primary responsibility (APR),[18] but it also will be impossible

---

14. *See e. g. John B. Hull, Inc. v. Waterbury Petroleum Products, Inc.*, 588 F.2d 24, 27 (2d Cir. 1978); *Sonesta International Hotels Corp. v. Wellington Associates*, 483 F.2d 247, 250 (2d Cir. 1973). Recent decisions in the Second Circuit, however, suggest that closer adherence to the irreparable injury standard is now required. *See Jack Kahn Music Co., Inc. v. Baldwin Piano & Organ Company*, 604 F.2d 755, 758 (2d Cir. 1979); *Jackson Dairy, Inc. v. H. P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir. 1979).

15. Indeed, the Seventh Circuit rule is just the opposite. Where there is a strong showing of irreparable harm, the movant may be held to a lesser standard of proving likelihood of success on the merits. *Fox Valley*, 545 F.2d at 1098;

*Mullis v. Arco Petroleum Corp.*, 502 F.2d 290, 293 (7th Cir. 1974).

16. The only exception to this general rule is when the Court, invoking the authority granted by Fed.R.Civ.P. 65(a)(2), orders that the trial on the merits of the action be advanced and consolidated with the hearing on the motion for preliminary injunctive relief. Rule 65(a)(2) was not utilized in this proceeding.

17. As Voltaire observed in *Candide*, anything is "possible."

18. An APR is a specific geographic area which the licensing agreement assigns to each Sealy licensee. Within this area, the designated licensee maintains responsibility for satisfactory

to calculate the profit that Ohio would have made from sales outside the Portland APR.

■ It is true that difficulty in ascertaining the correct amount of damages is relevant in determining the existence of irreparable harm. And there have been instances in which the inability to calculate future losses has resulted in a finding of irreparable harm. *See Danielson v. Local 275*, 479 F.2d 1033, 1037 (2d Cir. 1973); *Interphoto Corp. v. Minolta Corp.*, 417 F.2d 621, 622 (2d Cir. 1969); *Supermarket Services, Inc. v. Hartz Mountain Corp.*, 382 F.Supp. 1248, 1256 (S.D.N.Y.1974). However, it also is recognized that there is broad latitude in establishing damages in private antitrust actions. *Jack Kahn Music Co., Inc. v. Baldwin Piano & Organ Company*, 604 F.2d 755, 763 (2d Cir. 1979); *Triebwasser & Katz v. American Telephone & Telegraph Co.*, 535 F.2d 1356, 1359 (2d Cir. 1976). While the amount of damages may not be calculated solely on the basis of mere speculation or guesswork, neither is it required that the damages be based on mathematical certainties. Rather, the finder of fact "may make a just and reasonable estimate of the damage based on the relevant data presented at trial and render its decision accordingly." *Bailey v. Meister Brau, Inc.*, 535 F.2d 982, 991 (7th Cir. 1976).

The Court believes that such an estimate is possible in this case. Indeed, it is more than a little disingenuous for Ohio to suggest otherwise. In *Ohio-Sealy Mattress Manufacturing Co. v. Sealy, Inc.*, 585 F.2d 821 (7th Cir. 1978), *cert. denied*, 440 U.S. 930, 99 S.Ct. 1267, 59 L.Ed. 486 (1979), Ohio in fact devised a method for calculating its lost profits resulting from increased sales it would have earned had Sealy not purchased an intended acquiree by invoking its right of first refusal. This method involved application of a representative Ohio plant profit margin to the sales actually made by Sealy after acquisition. The fact that the

Seventh Circuit allowed this calculation to stand reflects its view that the method provided a sufficiently precise measure of damages. *Ohio-Sealy*, 585 F.2d at 833 n. 18. In addition, it must be observed that Ohio owns five subsidiaries in various regions of the country. Thus, there is a wealth of comparative data from which Ohio—and a fact finder—can draw inferences as to the amount of damages suffered by Ohio's inability to purchase Portland as planned.[19] Establishment of damages by this method might well be inexact in a mathematical sense. But so long as it is a "just and reasonable estimate," Ohio cannot claim that the harm from this imprecision is irreparable.

■ Moreover, even if the Court were to conclude that the damages were irreparable due to the inability to calculate accurately the lost profits, it would be inappropriate to issue an injunction on this basis. It is clear that injunctive relief should not be granted if it would be unavailing in preventing the irreparable harm of which the movant complains. *Mullis v. Arco Petroleum Corporation*, 502 F.2d 290, 293 (7th Cir. 1974). In this case, Ohio alleges that it will be deprived of adequate compensation for the profits it would have made had it been able to purchase Portland as planned. Thus, the harm stems from Ohio's inability to obtain Portland *now*, not from Sealy's imminent purchase of Portland. An order enjoining Sealy from closing on its purchase of Portland in no way would forestall this harm.

Ohio appears to recognize this, as it now asks the Court not only to enjoin Sealy's scheduled purchase of Portland, but to declare that Ohio should be permitted to purchase Portland on January 31, 1980. This, of course, the Court cannot do. Although a great deal of evidence was adduced before the magistrate, this action still is in a very

---

sales performance. Licensees also are permitted to make sales outside of their APRs, but such sales have been conditioned upon certain payments which will be discussed more fully *infra*.

19. In none of the cases cited by Ohio, in which the damages were found to be incalculable, did there exist such comparative data from which inferential estimates of damages could be made.

preliminary posture. Should the case go to trial, the parties no doubt will introduce a great deal more evidence, particularly on the antitrust claims. Only then will it be appropriate for the Court to determine conclusively who shall have the right to purchase Portland. Until that time, the right of first refusal is a legal right conferred upon Sealy by the licensing agreements. The most that Ohio could hope to accomplish at this stage of the proceedings is to enjoin the exercise of that right; it certainly is not entitled to have that right eliminated *in toto*.

Ohio also claims that irreparable harm would occur if the Court permits Sealy—a fierce antagonist of Ohio—to purchase Portland. Ohio's theory is that Sealy, through its operation of Portland, will develop "good will" in the sense of close relationships with Portland customers. Thus, Ohio contends that if it later does obtain Portland, Sealy will be able to exploit this good will to Ohio's detriment. Somewhat inconsistently, Ohio also argues that if Sealy knows its purchase of Portland will be divested if Ohio prevails on the merits, Sealy might allow Portland to deteriorate as a business.

Neither of these theories support a conclusion of irreparable harm. This case is distinguishable from the line of decisions in which loss of good will was found to be irreparable harm. In *F. & M. Schaefer Corp. v. C. Schmidt & Sons, Inc.*, 597 F.2d 814 (2d Cir. 1979), for example, the court affirmed the issuance of a preliminary injunction preventing the defendant corporation from purchasing a 29 percent interest in the plaintiff corporation. In finding the existence of irreparable harm, the court emphasized the ill-effects that could arise from this sizable interest being held by a *direct competitor* of Schaefer:

> Schmidt would have access to the confidential trade information of one of its leading competitors, including its marketing, pricing, advertising, and new product plans, and could possibly steer Schaefer in a direction that would favor Schmidt's interests at the expense of Schaefer. . .

> In addition there would be the risk of decreased organizational morale among Schaefer executives, unsure whether the fruits of their efforts would be siphoned to Schmidt, and among Schaefer's sales personnel and wholesalers, who might forsake it for other brands rather than face the prospect that a Schmidt takeover would result in their being supplanted by its wholesalers.

597 F.2d at 818.

In this and other "good will" cases, the factual pattern usually has been one in which the movant for injunctive relief is an intended acquiree of a direct competitor. As is evident from *Schaefer*, the prospect of a competitor controlling, or even influencing, the acquiree's business affairs is a troubling one. Such a situation well might jeopardize the future of the acquiree. The instant case, however, does not involve a purchase of a direct competitor; rather, it poses the question of which of two potential competitors—Ohio and Sealy—should have the right to purchase a third company—Portland. To the extent that Ohio suggests that Sealy will allow Portland to deteriorate, this harm is far too speculative a foundation upon which to base a finding of irreparable harm. *Jack Kahn Music*, 604 F.2d at 761. Moreover, even if Sealy were inclined to allow Portland to deteriorate—and there is no evidence that it would—Ohio's continued viability as a business would not be threatened. Thus, the reasoning of *Schaefer* is inapplicable to this situation. To the extent that Ohio argues that it will be harmed by Sealy's exploitation of the good will it develops while owning Portland, there again is the problem of the speculative nature of the alleged harm. There is no evidence in the record to suggest that Sealy intends to use any good will developed to impede Ohio's operations should Ohio prevail on the merits and obtain Portland.

In addition, *Schaefer* observed that the extreme remedy of a preliminary injunction might not be necessary in a case

\* \* \* \* \* \*

where there were available other means of avoiding the anticipated harm. 597 F.2d at 818; *see Kennecott Copper Corp. v. Curtiss-Wright Corp.*, 584 F.2d 1195 (2d Cir. 1978). In this case, the concerns expressed by Ohio may be addressed by a hold-separate order which insulates Sealy from control of Portland's day-to-day operations. This further minimizes the likelihood that Sealy will intentionally allow Portland to deteriorate, or that Sealy will be able to develop close working relationships with Portland's customers during the pendency of this litigation. Thus, if Ohio does gain possession of Portland, it will receive what it bargained for in the first instance: the good will and relationships developed by Portland through the years. Injunctive relief is neither necessary nor appropriate to obtain this end.

Finally, Ohio argues that if Sealy is permitted to close its purchase of Portland, the unavailability of the remedy of divestiture in private antitrust litigation might prevent Ohio from ever gaining possession of Portland even if Ohio prevails on the merits. The case law is split on whether private parties may obtain divestiture in antitrust litigation. *Compare Bosse v. Crowell Collier and MacMillan*, 565 F.2d 602 (9th Cir. 1977) (divestiture unavailable) *with NBO Industries Treadway Cos. v. Brunswick Corp.*, 523 F.2d 262 (3d Cir. 1975), *rev'd on other grounds sub nom. Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977); *Berkey*

*Photo, Inc. v. Eastman Kodak Co.*, 457 F.Supp. 404 (S.D.N.Y.1978) (divestiture available). The Seventh Circuit has not foreclosed the availability of divestiture in private antitrust litigation.[20]

Whatever the legal availability of divestiture to separate a fully consummated purchase, the Court believes that it possesses the authority to allow the prospective purchase of Portland upon the condition that Sealy divest itself of the purchase if it loses on the merits.[21] Indeed, by issuing a hold-separate order, the Court facilitates the future possibility of resale of Portland to Ohio by preventing the separate corporate identities of Portland and Sealy from merging into one. If Ohio should prevail on the merits, the Court could consider the question of whether resale to Ohio is needed in order to make Ohio whole without being concerned that divestiture would place an onerous burden on Sealy. Therefore, Ohio cannot claim irreparable harm on the basis of the unavailability of divestiture. A hold-separate order which preserves Ohio's right to obtain Portland if (1) it prevails on the merits and (2) the Court finds no legal impediment to an order compelling resale of Portland to Ohio, is sufficient to protect Ohio's interests.[22]

As is clear from the foregoing, Ohio has failed to carry its burden of proving that it will suffer irreparable harm if the Court fails to enjoin Sealy's scheduled purchase of

**20.** *Ohio-Sealy*, 585 F.2d at 845 n. 34. Moreover, the Court in passing notes that Ohio's concern about the availability of undoing the purchase of Portland assumes that liability will be found only on the antitrust claims. Although the Court at this time expresses no view on the merits of Ohio's common law claims, *see* note 26, *infra*, the Court does observe that if Ohio should prevail on these theories, the Court's broad equitable powers could be used to fashion a remedy which includes the relief that Ohio seeks.

**21.** This is not a situation in which the Court is viewing a completed transaction retrospectively and considering the appropriate after-the-fact remedial measures. Rather, this case presents a prospective sale, thus permitting the Court far greater latitude in ensuring that the

sale does not preclude the availability of certain remedies to Ohio. Accordingly, the Court considers the debate concerning the availability of divestiture in private antitrust litigation to be inapplicable to the facts herein.

**22.** Ohio, on the other hand, argues that if an injunction is denied, the hold-separate order should provide unconditionally for divestiture of the Portland purchase and resale to Ohio should Ohio prevail on the merits. At this stage of the proceedings, however, it cannot be said with certainty that if Ohio's case is meritorious it will be entitled to purchase Portland. For now, it is sufficient that the possibility of such a purchase is preserved by the hold-separate order.

Portland.[23] Normally, the Court might forego further inquiry into the other prerequisites for injunctive relief. *Fox Valley,* 545 F.2d at 1098; *Commonwealth of Pennsylvania ex rel. Creamer v. United States Department of Agriculture,* 469 F.2d 1387, 1388 (3d Cir. 1972). The Court, however, finds it appropriate in this case to examine the other factors relevant to the issue of injunctive relief. While the equities of this case do not warrant injunctive relief, they do justify the intermediate step of a hold-separate order. This order will impose substantial conditions upon Sealy's purchase of Portland. Sealy apparently has no objection to the entry of such an order, and the order provides for the signed agreement of the parties. However, the Court deems it important to note that such an order could issue—even without Sealy's acquiescence— on the basis of the plaintiff's likelihood of success on the merits of this litigation and the yet-prospective nature of the Portland purchase.[24] Thus, the Court now turns to the remaining elements of the *Fox Valley* test for preliminary injunctive relief.

### B. Balance of Hardships

Inasmuch as the Court found that Ohio will suffer no irreparable harm as a result of the purchase conditioned upon a hold-separate order, it cannot be said that more harm will accrue to Ohio from the denial of injunctive relief than would come to Sealy if an injunction were granted. Ohio, however, argues that there are several other indicia of hardship which tip the balance in favor of granting injunctive relief.

Ohio cites the magistrate's finding that Portland may suffer irreparable harm from the uncertainty as to who will be its ultimate purchaser. An injunction merely preventing Sealy from purchasing Portland on January 31, however, would not resolve Portland's dilemma. The only thing that can provide Portland with the certainty it seeks is an ultimate determination as to who is entitled to purchase Portland: Ohio or Sealy. As indicated above, this issue simply cannot be resolved at this stage of the proceedings. Ohio also suggests that Portland's alleged preference for Ohio as its purchaser should figure in the Court's analysis. Portland's preference as to its ultimate purchaser, however, is irrelevant to whether Sealy has the legal right to acquire Portland. Consequently, it is equally irrelevant to whether Ohio can enjoin preliminarily Sealy's purchase of Portland.

Finally, Ohio suggests that a preliminary injunction would be in the best interests of Sealy. Ohio reasons that since Sealy will be required to borrow heavily in order to purchase Portland, it will be injured seriously if it loses on the merits and is forced to divest its purchase. This sudden solicitousness for the well-being of Sealy is quite surprising in light of the heretofore acrimonious relationship between the parties. Nonetheless, it is misplaced. The Court is confident that Sealy is able to form judgments as to its own best interest without the assistance of Ohio. Moreover, if Ohio should prevail in its attempt to wrest ownership of Portland from Sealy, it will be able to do so only upon payment of a "fair price" to Sealy. *Ohio-Sealy,* 585 F.2d 845 n. 34.[25] Thus, the Court finds that the balance

---

**23.** Nor can the harm to Portland provide a basis for finding irreparable harm in this case. The Court agrees with the magistrate's finding that Portland will be harmed in some measure by uncertainty as to its ultimate owner. This harm, however, cannot be prevented by the granting of a preliminary injunction. All that such an injunction would accomplish is the delay of the closing date. Portland still would not have the certainty it needs. That can only be provided by a conclusive determination as to which party, Ohio or Sealy, is entitled to own Portland. Unfortunate though it may be for Portland, this determination can only be made after a full determination of the merits.

**24.** Indeed, were a hold-separate order providing for possible resale to Ohio not a realistic option in this case, the Court would have to reevaluate its conclusion that Ohio would not suffer irreparable harm if the sale is not enjoined.

**25.** Such a price would take for its baseline the purchase price paid by Sealy at the January 31, 1980, closing of its acquisition of Portland. At the conclusion of the litigation, the resale price of Portland to Ohio would be adjusted to take into account inflation as well as interest Sealy could have earned on the money paid for Portland—since a decision for Ohio surely would entitle it to the profits made by Portland while

of the hardships does not point in the direction of granting preliminary injunctive relief.

### C. Likelihood of Success on the Merits

■ To satisfy this prong of the test for granting preliminary injunctive relief, the movant must at the very least demonstrate that his claims are "so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberate investigation." *Mullis v. Arco Petroleum Corporation*, 502 F.2d 290, 293 (7th Cir. 1974); *see also Jack Kahn Music*, 604 F.2d at 763; *Fox Valley*, 545 F.2d at 1098; *Semmes Motors, Inc. v. Ford Motor Co.*, 429 F.2d 1197, 1205–1207 (2d Cir. 1970). In *Local Division 519*, 585 F.2d at 1351, the Seventh Circuit found that a trial court's conclusion that the moving party had a "good chance" to succeed on the merits was sufficient to meet this test.

■ Ohio has proven to this Court's satisfaction that it has more than a "good chance" to prevail on its claim under Section 1 of the Sherman Act.[26] The essence of any Section 1 violation is a contract, combination, or conspiracy to restrain trade. Ohio's theory under Section 1 is that Sealy's invocation of the right of first refusal was nothing more than an attempt to preserve the territorial market divisions of Sealy and its licensees by preventing Ohio from competing on the West Coast. Sealy, on the other hand, seeks to pose the issue solely as one involving whether Ohio has a "right" to extend its business operations to the West Coast. Whether or not Ohio possesses such a right is besides the point. The right which Ohio indisputably does possess is the right to conduct its business affairs free from attempts by Sealy to impose upon it restraints that are illegal under antitrust law. And the Court believes it reasonably likely that Ohio will prove on the merits that Sealy's exercise of its right of first refusal in this case constituted a Section 1 violation.

■ The history of Sealy and its encounters with the antitrust laws bears recounting in some detail. As originally structured, Sealy was jointly owned by a group of independent manufacturers to hold, develop, and license the Sealy trademark and promote the uniform nationwide marketing of the Sealy line of bedding products. Sealy neither manufactured nor marketed bedding itself. Under this scheme, the Supreme Court found that the arrangement of exclusive manufacturing and sales territories held by the licensees constituted horizontal territorial divisions,[27] a *per se* violation of Section 1. *United States v. Sealy, Inc.*, 388 U.S. 350, 87 S.Ct. 1847, 18 L.Ed.2d 1238 (1967).

In the wake of that opinion, Sealy restructured its operations in several ways. First, it eliminated the exclusive licensee territories; in its place, Sealy introduced the concept of APRs, and made licensees responsible for meeting certain performance requirements in their territories. In addition, Sealy imposed two charges on any sales made by a licensee outside of its APR.

---

under Sealy ownership—during the pendency of the litigation. Should the parties be unable to agree on this adjusted resale price, the Court would resolve the disagreement.

**26.** The magistrate found that Ohio also would prevail on its Section 7 claim, but was unlikely to do so on its state law claims. This Court's conclusion that Ohio is likely to prevail on its Section 1 claim makes it unnecessary to reach the other potential bases for liability.

**27.** Horizontal territorial restraints arise out of decisions by competitors, or potential competitors, to restrict competition *inter sese* by dividing the geographic market into exclusive enclaves. Vertical territorial restraints, on the other hand, involve a decision by one competi-

tor to impose territorial limitations on independent dealers as a condition of their right to sell that competitor's product. In *Sealy*, the Supreme Court found that Sealy's territorial allocations fell into the former category:

> The territorial arrangements must be regarded as the creature of horizontal action by the licensees. It would violate reality to treat them as equivalent to territorial limitations imposed by a manufacturer upon independent dealers as incident to the sale of a trademarked product. Sealy, Inc., is an instrumentality of the licensees for purposes of the horizontal territorial allocation. It is not the principal.

388 U.S. at 354, 87 S.Ct. at 1851.

First, Sealy required pass-over payments ranging from 2.2 percent to 11 percent of gross sales made out of the APR. These payments were made to Sealy, which in turn reimbursed the licensee in the "invaded" APR. Second, Sealy required a warranty repair payment of 1 percent of out-of-APR sales to cover the "invaded" licensee's purported expenses for product service repairs. The licensee agreements also assigned exclusive manufacturing territories, and forbade licensees to obtain an interest in any competing organization. Finally, Sealy instituted the right of first refusal clause.

Ohio, the plaintiff herein, filed suit in 1971 alleging that these changes in the licensing agreements were a transparent attempt by Sealy to continue the same market allocation policies that the Supreme Court had found illegal four years earlier. Ohio received a jury verdict in its favor, collecting $10,222,278.[28] On appeal, the Seventh Circuit affirmed.

At the outset, the court rejected the contention that Sealy's entrance into the manufacturing and sale of bedding rendered the corporate structure vertical.[29] The Court observed that the licensees still owned 98 percent of Sealy's shares, and that representatives of the licensees occupied at least 11 of the 14 seats on the board of directors as well as all the positions on the board's executive committee. Thus, the Court concluded that

> [w]hatever may be said about the way Sealy conducts its business in those territories, it is indisputably clear that any restraints applied to the independent businesses which are licensees result directly from the concerted action of their horizontal potential competitors.

585 F.2d at 827.

As for the practices instituted by Sealy after the Supreme Court decision in 1967, the Seventh Circuit observed that none were illegal in and of themselves. However, the Court held that a jury could find that these practices violated Section 1 if they were designed to achieve a division of markets. 585 F.2d at 827. The Court found there was substantial evidence from which a jury could infer such a purpose. There was evidence that the system of pass-over payments and warranty charges far exceeded the amount necessary to prevent out-of-territory licensees from taking a "free ride" at the expense of a licensee selling within his APR. *Id.* at 828–829. With respect to the right of first refusal, the Court observed that Sealy had exercised that contractual right only five times—in each instance the would-be purchaser was Ohio, who was the most aggressive out-of-APR seller of all the Sealy licensees.[30] On all three occasions when Sealy actually purchased a licensee pursuant to this right of first refusal, the businesses have lost money since the acquisition. *Id.* at 830. On this basis, the court concluded that despite Sealy's "more legitimate explanation of its exercises of the right of first refusal,"[31] the jury could—and did—find that a least one of the purchases made under the right of first refusal violated Section 1. *Id.* at 844. The Seventh Circuit then remanded the

**28.** The jury in *Ohio-Sealy* returned a verdict of $6,814,852 against Sealy. This amount was trebled pursuant to the antitrust laws, 15 U.S.C. § 15, to reach the total of $20,444,556 in damages. Ohio then accepted a remittitur of 50 percent of these treble damages, thereby making the final award of $10,222,278.

**29.** At the time of the Supreme Court decision in 1967, Sealy itself neither manufactured nor sold bedding. Thereafter, Sealy began to enter this aspect of the business through the purchases of licensees. By the time of the Seventh Circuit opinion, Sealy's market share of bedding had reached approximately 27 percent of all Sealy products sold.

**30.** The evidence presented before the magistrate showed that although Ohio accounts for less than 20 percent of all Sealy-label sales in the continental United States, it makes approximately 55 percent of all the out-of-APR sales in the Sealy organization. In 1978, 13.1 percent of its total sales were made out of its APRs, a significant increase from the 4.9 percent total registered in 1974.

**31.** At trial, Sealy had argued that its acquisition of licensees was spurred by the 1967 Supreme Court opinion, and represented an effort to reconstitute the Sealy manufacturing and sales function as a vertical structure.

case to the trial court to determine whether equitable relief was appropriate.

In the interim, Sealy has altered the composition of its board of directors. There now are only seven directors rather than fourteen: the president of Sealy and six outside directors who have no present or past interest in or affiliation with a licensee company. In addition, Sealy has proposed the elimination of the plant location clause, the passover payments, the warranty repair charge, and the prohibition against ownership of a competing mattress company. To date, Sealy has proposed no modification of the right of first refusal provision.[32]

Sealy objects to the magistrate's frequent reference to this history of conduct in reaching his conclusion that Ohio is likely to prevail on the merits of the Section 1 claim. It contends that the right of first refusal in this case, exercised by a "blue-ribbon" board of directors that is independent from the licensees, is clearly distinguishable from the prior exercises of that right as recounted in *Ohio-Sealy*. The Court agrees that Sealy should not be irrebuttably condemned in this case on account of its past behavior. Yet, neither can Sealy expect this Court—or a jury—to view the instant case in a vacuum. This is neither necessary nor desirable.[33] There are a number of factual issues in this case concerning the intent of Sealy which cannot be fairly viewed without reference to the history of Sealy in general, and its relationship with Ohio in particular.

One such issue involves the independence of the directors. Although six of the seven directors have no past affiliation with Sealy, it is not clear that the licensees exercise no influence or control over the board. One of the board members is the president of Sealy; a relevant factor will be the degree of influence he holds over the outside directors. Moreover, it is the Sealy licensees, who own more than 90 percent of Sealy's shares, that elect the "independent" directors. It would not be unreasonable for a jury to find that Sealy's new board of directors is not as independent as Sealy suggests. This is particularly so in light of Sealy's past conduct. The Seventh Circuit opinion portrays an effort by Sealy to preserve the same territorial allocations found illegal by the Supreme Court eleven years earlier, albeit by more covert means. Although this alone does not conclusively establish that this effort continues to the present, it is a factor that cannot be ignored in assessing Sealy's present conduct.

As was the case in *Ohio-Sealy*, Sealy has offered a number of legitimate business reasons for its decision to exercise its right of first refusal and purchase Portland.[34] However, the Court believes that it is reasonably likely that a jury will find these explanations outweighed by the evidence which tends to show an illegal purpose lurking behind the exercise. There is, of course, the evidence that Ohio has been the primary target for Sealy's exercise of its right of first refusal.[35] There also was evidence

---

**32.** It should be emphasized that pending the ruling on the equitable issues in *Ohio-Sealy v. Sealy*, Civil Case No. 71 C 1243 (N.D.Ill.), these modifications, with the exception of the new board of directors, offered by Sealy are not binding. Thus, while they are relevant factors in determining the intent of Sealy vis-a-vis Ohio, they cannot yet be considered as permanent changes in Sealy's practices.

**33.** *See* Fed.R.Ev. 404(b), which states that while evidence of past acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith, it may be used for other purposes, such as to prove intent. Although there is a fine line between the forbidden and the permissible use of prior acts evidence, the Court believes that a

jury, properly instructed, can use such evidence properly.

**34.** Sealy suggests that it decided to purchase Portland because at the price offered it represented a sound business investment. In addition, the decision allegedly was influenced by the fact that Sealy licenses are perpetual; thus, the only way to extinguish the license is for Sealy to acquire it.

**35.** Until 1978, Sealy had exercised its right of first refusal exclusively against Ohio. Since that time, Sealy has exercised its right of first refusal to prevent a purchase by Michigan. With that sole exception, Sealy has invoked its right of first refusal against no prospective purchaser other than Ohio.

adduced before the magistrate that Ohio pursues a policy of aggressively seeking sales outside its APR. In addition to its licensee, Portland, Sealy owns subsidiaries in the neighboring Northern California and Denver APRs. Over the past five years Ohio has sought a western location which would enable it to compete in these APRs.[36] The evidence before the magistrate tended to prove that Sealy consistently had acted in such a way as to prevent Ohio from gaining a foothold in the western territory.[37] Moreover, until Ohio had contracted to purchase Portland, Sealy had expressed no interest in obtaining that licensee. Finally, there is the fact that Sealy was forced to incur substantial indebtedness to purchase Portland, and did so despite its projections that as a Sealy subsidiary Portland would not turn a profit for at least five years.

 These facts bear strong similarity to those which the court in *Ohio-Sealy* found sufficient to sustain a Section 1 violation. Despite Sealy's protestations to the contrary, these facts could form the basis for a conclusion that the right of first re-

fusal was exercised in order to maintain the horizontal market division among the licensees.[38] Thus, the Court finds it reasonably likely that Ohio will prevail on its Section 1 claim.

### D. *The Public Interest*

The Court does not find that the public interest would be disserved in this case by the grant of injunctive relief, particularly since this action involves private parties. Indeed, to the extent the public interest is implicated in this action, it would be served by enjoining a purchase by Sealy which the Court believes is reasonably likely to be anticompetitive in purpose.

### *Conclusion*

 On the basis of the foregoing, the Court finds that Ohio is not entitled to enjoin preliminarily Sealy's scheduled purchase of Portland. Although Ohio has satisfied the Court that it is reasonably likely to prevail on the merits of its case, it has failed to show that it would suffer irreparable harm or that the balance of hardships would tip in its favor if an injunction did not issue.[39] The conclusion as to irrepara-

---

**36.** As matters now stand, Ohio's closest plant to the West Coast is in Fort Worth, Texas, more than 1,000 miles away. Sealy, on the other hand, owns the five most westernly-located plants in the Sealy organization. Because of the bulk and weight of bedding products, the high cost of transportation, the reluctance of retailers to warehouse bedding products, and the need for customer sales calls, the bedding industry is highly localized. Rarely can a company serve areas more than 200–300 miles from its plant. As a result, Ohio is unable to make sales in the western APRs from any of its present locations.

**37.** In August, 1976, Ohio sought approval to build a plant in Las Vegas, Nevada, or elsewhere in the western United States. This request was denied by the Sealy board of directors in March, 1977. Ohio renewed its request in April and May of 1977. In September, 1978, the board—which already had been restructured so as to be "independent" from the licensees—once again denied the request.

**38.** Sealy also asserts that the restructuring of the board of directors has rendered the corporate entity vertical rather than horizontal. As observed by the Seventh Circuit in *Ohio-Sealy*, however, the key factor in determining whether to treat this as a horizontal or vertical market

allocation case is whether the alleged allocation is the result of concerted action by licensees against a horizontal potential competitor. 585 F.2d at 827. Thus, it cannot be said as a matter of law that the reconstituted board of directors eliminates the horizontal nature of the alleged market allocation. Rather, the critical question will involve the actual degree of independence of the directors from the licensees. As indicated above, there is strong reason to question the independence of the directors. For this reason, the Court believes it reasonably likely that Ohio will be able to show that the alleged market allocation is horizontal in nature, notwithstanding the installation of the new directors.

**39.** The magistrate's recommendation that the purchase be enjoined stemmed from his view that it would be prudent to wait for a ruling on the equitable issues in the remand of *Ohio-Sealy v. Sealy, Inc.*; and if no decision was forthcoming by April 30, 1980, to deny preliminary relief to Ohio and allow Sealy to close the purchase. Given the finding that there is no irreparable harm that will result from the denial of injunctive relief, the Court believes it would be inappropriate to enjoin the purchase. Moreover, issuance of a hold-separate order will serve the function usually performed by

ble harm and the balance of the hardships, however, was based in part on the Court's view that the damages of which Ohio complained for the most part could be addressed by the less drastic remedy of a hold-separate order.

Accordingly, the Court's denial of preliminary injunctive relief does not mean that Sealy will be allowed to make its purchase of Portland completely unfettered. Rather, the Court will permit Sealy to close its purchase of Portland as scheduled on January 31, 1980, but subject to the provisions of the hold-separate order included in this opinion as Appendix A. Read together, the hold-separate order and the Court's opinion ensure that Ohio will not be harmed irreparably should Sealy's purchase of Portland be subsequently adjudged improper. The terms of the hold-separate order require that Sealy and Portland retain their separate identities throughout the course of this litigation.[40] This opinion directs that if at the conclusion of the litigation Ohio has prevailed on the merits, it shall be entitled to purchase Portland from Sealy so long as the Court finds no legal bar to such a sale.[41] Of course, should Sealy prevail in this litigation, it then will be entitled to merge Portland into its corporate structure as a wholly-owned subsidiary. It is so ordered.

## APPENDIX A

### HOLD–SEPARATE ORDER

IT IS ORDERED that, subject to further order of this Court, Sealy after acquisition of Portland shall hold and maintain Portland as a separate and viable company and make or cause to be made no change in the ownership, business, operation, or condition thereof which might hinder later divestiture of the acquisition of resale of Portland to Ohio, pending the final decision herein. Without limiting the foregoing:

1. Sealy shall not sell, transfer, grant any option for the purchase or acquisition of, or otherwise dispose of the capital stock of Portland.

2. Sealy shall not mortgage, pledge or otherwise encumber or (other than as provided in paragraph 1 above) agree to any direct or indirect restriction on the transfer of the capital stock of Portland; provided, however, that Sealy may so mortgage, pledge or otherwise encumber or agree to any such restriction as security for (a) any borrowings incurred in connection with the purchase of such capital stock or with the purchase of capital stock of Ohio delivered as part of the consideration for such capital stock, or (b) any borrowings incurred to refund the borrowings referred to in clause (a), if the documents evidencing such security shall acknowledge the possibility of an order of divestiture or resale to Ohio in these proceedings and shall provide that (i) in the event of such divestiture or resale, the assets or stock so mortgaged, pledged or otherwise encumbered or restricted as to transfer shall be transferable free of such mortgage, pledge, encumbrance or restriction and, in such event, the sole security for such borrowings shall be a pledge of the proceeds of such resale; and (ii) in the event of default on such borrowings prior to such divestiture or resale, Ohio shall be given notice thereof and shall be given an opportunity to satisfy Sealy's obligations or

---

injunctive relief. In this case, it will ensure that Ohio is not deprived the right to undo the transaction if it prevails on the merits and the Court finds no legal impediment to resale to Ohio. In this sense at least, the hold-separate order will preserve the status quo pending the outcome of this litigation.

**40.** The Court will retain jurisdiction over Sealy's operation of Portland to ensure compliance with the provisions of the hold-separate order.

**41.** It is clear from this opinion that the Court does not consider the possible unavailability of divestiture in private antitrust litigation to con-

stitute a bar to resale of Portland to Ohio after trial. If Ohio prevails on the merits, the question will not be whether Sealy may be compelled to sell Portland, but rather, whether Ohio's purchase of Portland would be illegal itself. The record reflects no such illegality; nor does the Court at this time foresee any problems with a sale of Portland to Ohio. The Court, however, expresses no final conclusion as to this issue. The parties are not foreclosed from raising claims of illegality at a later time in these or other proceedings.

cure such default and be subrogated to the second party's rights against Sealy.

3. Sealy shall not cause or permit Portland (i) to incur any secured indebtedness to Sealy or any entity or person controlled by Sealy; (ii) to incur any unsecured indebtedness to Sealy or such entity or person unless such unsecured indebtedness is repayable at any time without premium and bears interest at or below the prime rate in effect from time to time; (iii) to incur any unsecured or secured indebtedness to any other person unless necessary to refund unsecured or secured indebtedness outstanding on the date of this order or permitted hereby; (iv) to purchase any debt or equity security of Sealy or make any loan to Sealy; or (v) to enter into any material contract out of the ordinary course of business without the prior approval of this Court. (For purposes hereof, "indebtedness" shall mean any obligation, including a guarantee, for the payment of money borrowed.)

4. Sealy shall not cause or permit Portland (i) to change its corporate name; (ii) to adopt or effect any plan of liquidation or dissolution; or (iii) to adopt or effect any plan of merger, reorganization or consolidation or for the sale of all or substantially all of the assets.

5. Sealy shall not cause or permit Portland (i) to sell, assign, sublicense, modify to its detriment, pledge, or otherwise dispose of or encumber the License Agreement or any of its rights thereunder; (ii) to sell, assign, sublease, modify to its detriment, pledge, or otherwise dispose of or encumber the [Portland or Seattle] leases or the leasehold interests created thereby; (iii) to sell, assign, mortgage, pledge, or otherwise encumber any tangible or intangible assets (now owned or hereafter acquired) or the products or proceeds thereof, other than in the ordinary course of business or in connection with the incurrence of secured indebtedness permitted by clause (iii) of paragraph 3 above; or (iv) to obligate itself to do any of the foregoing.

6. Sealy shall direct and cause Portland, and if necessary shall make loans to Portland under clause (ii) of paragraph 3 in amounts adequate (i) to maintain insurance for amounts and against risks as are appropriate to a company its size in its industry; (ii) to perform its obligations under the Portland and Seattle leases and the License Agreement; (iii) to repair or replace plant and equipment in the ordinary course of business; (iv) to pay all federal, state, and local taxes when and as the same shall be due and payable, subject to Sealy's right to contest such taxes; (v) to comply with all laws and regulations the failure to comply with which would materially and adversely affect Portland; and (vi) to remain a corporation in good standing in the States of Oregon and Washington.

7. Sealy shall direct and cause Portland (i) to maintain, in accordance with sound accounting practice, separate, true and complete financial ledgers, books, and records; (ii) to prepare, in accordance with generally accepted accounting principles applied in a manner consistent with prior periods, financial statements which fairly present the financial position of Portland as at the end of, and the results of its operations and changes in its financial position for, each fiscal quarter; and (iii) to supply the Court with quarterly and annual financial statements within 30 days of the end of each fiscal quarter or within 90 days of the end of each fiscal year as the case may be, which annual financial statements shall be audited and covered by the report of a certified public accountant selected by agreement of the parties. If the parties are unable to reach agreement as to an accountant, the Court will designate a certified public accountant to perform the audits. Such audits will be conducted at the expense of Ohio.

8. Sealy shall pay to Portland on an annual basis an amount equal to the tax savings, if any, realized by Sealy as a result of the inclusion of Portland in its consolidated tax returns, state and federal.

9. Sealy shall not, and shall not cause or permit Portland to, take any action, direct or indirect, which would cause any changes or alterations to be made in Portland's business or operations including but not limited to changes in Portland's manufacturing, marketing and distribution organizations,

or in Portland's banking relationships, except for any such changes or alterations as may be prudent in the ordinary course of business.

10. Sealy shall not, and shall not cause or permit Portland to, make any changes in the management of Portland except (i) to replace directors who die, resign, decline to stand for reelection, or when such replacement of a director at the conclusion of his or her term would be in the best interest of Portland; and (ii) to replace managerial employees who voluntarily resign or who are discharged for cause, including but not limited to incompetence in the reasonable judgment of Sealy. The person who replaces any such director may be designated by Sealy but shall not be an associate of Sealy at the time of such replacement not during, or within five years after the expiration of, his term as a director and shall not have been an associate of Sealy at any time during the five-year period prior to such replacement. (For purposes herein, "associate" shall mean a stockholder, director, officer, or employee of Sealy or a controlling person, spouse, or other relative of any such person.) Sealy shall incur no obligation on behalf of Portland which would require that any employee or director be retained or compensated after any Court order compelling divestiture or resale of Portland to Ohio.